UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ANTHONY MUNGIN,

               Petitioner,

vs.                                            Case No. 3:06-cv-650-BJD-JBT

SECRETARY, FLORIDA DEPARTMENT
OF CORRECTIONS, et al.,

               Respondents.

_____

## **ORDER**

## I.   INTRODUCTION

Through counsel, Petitioner Anthony Mungin, a death-sentenced inmate, filed a Petition for Writ of Habeas Corpus (Petition) (Doc. 1) under 28 U.S.C. § 2254. He is proceeding on a Second Amended Petition for Writ of Habeas Corpus by a Death-Sentenced Person in State Custody Pursuant to 28 U.S.C. § 2254 (Second Amended Petition) (Doc. 30).[1] He challenges a state court (Duval County) conviction for murder in the first degree.

---

[1] Petitioner filed the original Petition (Doc. 1) on July 18, 2006. He sought leave to amend the Petition (contained within the Petition) and the Court granted leave to amend. Order (Doc. 3). He filed an Amended Petition (Doc. 6) on November 6, 2006. Petitioner attempted to supplement claim 1 of the Amended Petition and the Court struck the supplement and directed Petitioner to file a second amended petition as the operative petition. Order (Doc. 27). On October 6, 2014, Petitioner filed a Second Amended Petition (Doc. 30). Recently, the Court denied Petitioner's Motion to Amend (Doc. 81). See Order (Doc. 90).

Respondents filed an Answer to Petition for Writ of Habeas Corpus (Doc. 16) in response to the Amended Petition.[2]   After Petitioner filed his Second Amended Petition, Respondents filed an Amended Answer to Petition for Writ of Habeas Corpus (Response) (Doc. 31)[3] and a supplemental state court record, referred to as an Appendix on this Court's docket (Doc. 32), using numerals to designate the tabs of the supplemental record.[4]   Petitioner filed a Reply to Amended Answer to Second Amended Petition for Writ of Habeas Corpus (Reply) (Doc. 35).[5]   See Order (Doc. 9).

Petitioner raises seven grounds in the Second Amended Petition:

---

[2] Respondents filed an Appendix (Doc. 15), not scanned, and filed separately on October 25, 2007.   The Court will hereinafter refer to the Exhibits contained in the Appendix as "Ex." Of note, the exhibits are not all bound and tabbed in alphabetical order.   The page numbers referenced are the Bates stamp numbers at the bottom of each page of the exhibit. Otherwise, the page number on the document will be referenced.   For the scanned documents (Second Amended Petition, Response, Reply, etc.), the Court references the page numbers assigned by the electronic filing system.

[3] Respondents provided the Court with a Habeas Corpus Checklist (Doc. 15) and a Habeas Corpus Checklist (cont'd from 10/25/07) (Doc. 32).

[4] Respondents filed an Appendix (Doc. 32), not scanned, and filed separately on December 22, 2014.   The Court will hereinafter refer to the exhibits contained in the Appendix as "App."   Of note, these exhibits are not all bound and tabbed in numerical order.   The page numbers referenced are the Bates stamp numbers at the bottom of each page of the exhibit. Otherwise, the page number on the document will be referenced.

[5] Petitioner, on July 2, 2007, filed a List of Claims in Amended Petition for Writ of Habeas Corpus (List) (Doc. 8).   However, he did not file an updated list after filing the Second Amended Petition; therefore, the claims and page numbers referenced in the List do not correspond with the claims and page numbers of the Second Amended Petition.   Of note, in the Second Amended Petition, one additional claim is raised under Claim I: D. (State's Withholding of Material Exculpatory Evidence, Presentation of False and/or Misleading Evidence and Trial Counsel's Ineffectiveness) and it is not included in the List.

Claim 1: "Mr. Mungin received ineffective assistance of counsel at the guilt phase of his capital trial, in violation of the Sixth Amendment to the United States Constitution[;]"

Claim 2: "Mr. Mungin received ineffective assistance of counsel at the penalty phase in violation of the Sixth Amendment[;]"

Claim 3: "The Duval County Public Defender's Office had an actual conflict of interest based on prior and simultaneous representation of key state witness Kirkland, in violation of Mr. Mungin's Sixth Amendment right to conflict-free counsel [;]

Claim 4: "The Florida Supreme Court erred in its ruling on direct appeal that <u>Griffin v. United States</u>, 502 U.S. 46 (1991), compelled a finding that reversal of Mr. Mungin's conviction for first-degree murder[;]"

Claim 5: "The Evidence was insufficient to prove the underlying felony as proof of felony murder[;]"

Claim 6: "Mr. Mungin received ineffective assistance of counsel on direct appeal in violation of the Sixth Amendment[;]" and

Claim 7: "The Florida Supreme Court's determination that the Introduction by the State of Evidence that Mr. Mungin shot a collateral crime victim in the spine was harmless error was error."

Second Amended Petition at 63, 119, 136, 140, 145, 148, 164 (capitalization and emphasis omitted).

3

## II.   MOTION TO STRIKE

Imbedded in the Response is a Motion to Strike (Motion).   Response at 5-6.   This Motion is due to be stricken.   Pursuant to Rule 12(f)(2) of the Federal Rules of Civil Procedure, the court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter upon motion made by a party **before responding to the pleading**. Here, Respondent did not move to strike before responding to the pleading and failed to file a separate motion that complies with Rule 12 and Local Rule 3.01(a) (requiring the filing of a motion in a single document no longer than 25 pages).   Indeed, it is improper to seek affirmative relief by imbedding a request in a response.   See Rule 7(b)(1), Fed. R. Civ. P.   Thus, the Court will **strike** Respondent's Motion to Strike contained within the Response.

## III.   EVIDENTIARY HEARING

"In a habeas corpus proceeding, the burden is on the petitioner to establish the need for an evidentiary hearing."   Jones v. Sec'y, Fla. Dep't of Corr., 834 F.3d 1299, 1318 (11th Cir. 2016) (citations omitted), cert. denied, 137 S. Ct. 2245 (2017).   To be entitled to an evidentiary hearing, the petitioner must allege "facts that, if true, would entitle him to relief."   Martin v. U.S., 949 F.3d 662, 670 (11th Cir.) (quoting Aron v. U.S., 291 F.3d 708, 715 (11th Cir. 2002)) (citation omitted), cert. denied, 141 S. Ct. 357 (2020).   See Chavez

v. Sec'y, Fla. Dep't of Corr., 647 F.3d 1057, 1060 (11th Cir. 2011) (opining a petitioner bears the burden of establishing the need for an evidentiary hearing with more than speculative and inconcrete claims of need), cert. denied, 565 U.S. 1120 (2012); Dickson v. Wainwright, 683 F.2d 348, 351 (11th Cir. 1982) (same).

If the allegations are contradicted by the record, patently frivolous, or based upon unsupported generalizations, the court is not required to conduct an evidentiary hearing.   Martin, 949 F.3d at 670 (quotation and citation omitted).   In this case, the pertinent facts are fully developed in this record, or the record otherwise precludes habeas relief;[6] therefore, the Court can "adequately assess [Petitioner's] claim[s] without further factual development," Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003), cert. denied, 541 U.S. 1034 (2004).

Petitioner has not met his burden as the record refutes the asserted factual allegations or otherwise precludes habeas relief.   Therefore, the Court finds Petitioner is not entitled to an evidentiary hearing.   Schriro v. Landrigan, 550 U.S. 465, 474 (2007).

---

[6] Petitioner was represented by counsel in state-court post-conviction proceedings, and the state court conducted evidentiary hearings.

## IV.   HABEAS REVIEW

Federal courts are authorized to grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."   Lee v. GDCP Warden, 987 F.3d 1007, 1017 (11th Cir.) (quoting 28 U.S.C. § 2254), cert. denied, 142 S. Ct. 599 (2021). For issues previously decided by a state court on the merits, this Court must review the underlying state-court decision under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).   In doing so, a federal district court must employ a very deferential framework.   Sealey v. Warden, Ga. Diagnostic Prison, 954 F.3d 1338, 1354 (11th Cir. 2020) (citation omitted) (acknowledging the deferential framework of AEDPA for evaluating issues previously decided in state court), cert. denied, 141 S. Ct. 2469 (2021); Shoop v. Hill, 139 S. Ct. 504, 506 (2019) (per curiam) (recognizing AEDPA imposes "important limitations on the power of federal courts to overturn the judgments of state courts in criminal cases").

Thus, "[u]nder AEDPA, a court cannot grant relief unless the state court's decision on the merits was 'contrary to, or involved an unreasonable application of,' Supreme Court precedent, or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"   McKiver v. Sec'y, Fla. Dep't of Corr., 991 F.3d 1357, 1364 (11th

Cir.) (citing 28 U.S.C. § 2254(d)(1)-(2)), cert. denied, 142 S. Ct. 441 (2021).   The

Eleven Circuit instructs:

> A state court's decision is "contrary to" clearly
> established federal law if the state court either reaches
> a conclusion opposite to the Supreme Court of the
> United States on a question of law or reaches a
> different outcome than the Supreme Court in a case
> with "materially indistinguishable facts." Williams
> v. Taylor, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 146
> L.Ed.2d 389 (2000).   "Under the 'unreasonable
> application' clause, a federal habeas court may grant
> the writ if the state court identifies the correct
> governing legal principle" from Supreme Court
> precedents "but unreasonably applies that principle to
> the facts of the prisoner's case." Id. at 413, 120 S. Ct.
> 1495.

Lee, 987 F.3d at 1017-18.   Therefore, habeas relief is limited to those occasions

where the state court's determinations are unreasonable, that is, if no

fairminded jurist could agree with them. McKiver, 991 F.3d at 1364.

This high hurdle is not easily surmounted.   If the state court applied

clearly established federal law to reasonably determined facts when

determining a claim on its merits, "a federal habeas court may not disturb the

state court's decision unless its error lies 'beyond any possibility for fairminded

disagreement.'" Shinn v. Kayer, 141 S. Ct. 517, 520 (2020) (per curiam)

(quoting Harrington v. Richter, 562 U.S. 86, 103 (2011)).   Also, a state court's

finding of fact, whether a state trial court or appellate court, is entitled to a

presumption of correctness under 28 U.S.C. § 2254(e)(1).   "The state court's

factual determinations are presumed correct, absent clear and convincing evidence to the contrary." Sealey, 954 F.3d at 1354 (quoting 28 U.S.C. § 2254(e)(1)). See Hayes v. Sec'y, Fla. Dep't of Corr., 10 F.4th 1203, 1220 (11th Cir. 2021) (Newsome, Circuit Judge, concurring) (recognizing the universal requirement, applicable to all federal habeas proceedings of state prisoners, set forth in 28 U.S.C. § 2254(e)(1).

## V.   INEFFECTIVE ASSISTANCE OF COUNSEL

Claims of ineffective assistance of counsel are "governed by the familiar two-part Strickland[v. Washington, 466 U.S. 668 (1984)] standard." Knight v. Fla. Dep't of Corr., 958 F.3d 1035, 1038 (11th Cir. 2020), cert. denied, 141 S. Ct. 2471 (2021). To prevail on a claim of ineffective assistance of counsel, a petitioner must successfully show his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" as well as show "the deficient performance prejudiced the defendant, depriving him of a 'fair trial, a trial whose result is reliable.'" Raheem v. GDCP Warden, 995 F.3d 895, 908 (11th Cir. 2021) (quoting Strickland, 466 U.S. at 687), cert. denied, 142 S. Ct. 1234 (2022). As both components under Strickland must be met, failure to meet either prong is fatal to the claim. Raheem, 995 F.3d at 908 (citation omitted).

Not only is there the Strickland mandated layer of deference there is an additional layer of deference required by AEDPA to the state court's decision. Thus, given the double deference due, rarely is relief warranted upon federal habeas review on a claim of ineffective assistance of counsel once addressed on the merits in a state court proceeding.   See Tuomi v. Sec'y, Fla. Dep't of Corr., 980 F.3d 787, 795 (11th Cir. 2020) (asking, under § 2254(d), is there any reasonable argument that counsel satisfied Strickland's deferential standard), cert. denied, 141 S. Ct. 1721 (2021).

Petitioner also raises a claim of ineffective assistance of appellate counsel.   A claim of ineffective assistance of appellate counsel is governed by this same Strickland standard.   Id. (citing Philmore v. McNeil, 575 F.3d 1251, 1264 (11th Cir. 2009)).   As in a claim of ineffective assistance of trial counsel, failure to establish either prong of the Strickland standard is fatal to a claim of ineffective assistance of appellate counsel.   Id.

In applying the two-pronged standard established in Strickland, the Court is mindful that appellate counsel may weed out weaker, although meritorious arguments, as there is no duty under the Sixth Amendment to raise every non-frivolous issue.   Overstreet v. Warden, 811 F.3d 1283, 1287 (11th Cir. 2016).   Regarding the prejudice prong, "[a]ppellate] [c]ounsel's performance will be deemed prejudicial if we find that the neglected claim

would have a reasonable probability of success on appeal." Tuomi, 980 F.3d at 795 (quoting Philmore, 575 F.3d at 1265) (internal quotation omitted).

## VI.   THE OFFENSE

The Florida Supreme Court (FSC), in its opinion addressing Petitioner's direct appeal, detailed the facts of the case.   Mungin v. State, 689 So. 2d 1026, 1028 (Fla. 1995) (per curiam) (Mungin I), cert. denied, 522 U.S. 833 (1997). For context, the facts will be repeated here:

> Betty Jean Woods, a convenience store clerk in Jacksonville, was shot once in the head on September 16, 1990, and died four days later. There were no eyewitnesses to the shooting, but shortly after Woods was shot a customer entering the store passed a man leaving the store hurriedly with a paper bag. The customer, who found the injured clerk, later identified the man as Mungin. After the shooting, a store supervisor found a $59.05 discrepancy in cash at the store.

> Mungin was arrested on September 18, 1990, in Kingsland, Georgia. Police found a .25–caliber semiautomatic pistol, bullets, and Mungin's Georgia identification when they searched his house. An analysis showed that the bullet recovered from Woods had been fired from the pistol found at Mungin's house.

> Jurors also heard Williams[7] rule evidence of two other crimes. They were instructed to consider this evidence only for the limited purpose of proving Mungin's identity.

---

[7] Williams v. State, 110 So. 2d 654, 662 (Fla.), cert. denied, 361 U.S. 847 (1959).

First, William Rudd testified that Mungin came to the convenience store where he worked on the morning of September 14, 1990, and asked for cigarettes. When Rudd turned to get the cigarettes, Mungin shot him in the back. He also took money from a cash box and a cash register. Authorities determined that an expended shell recovered from the store came from the gun seized in Kingsland.

Second, Thomas Barlow testified that he saw Meihua Wang Tsai screaming in a Tallahassee shopping center on the afternoon of September 14, 1990. Tsai had been shot while working at a store in the shopping center. A bullet that went through Tsai's hand and hit her in the head had been fired from the gun recovered in Kingsland.

The judge instructed the jury on both premeditated murder and felony murder (with robbery or attempted robbery as the underlying felony), and the jury returned a general verdict of first-degree murder.

In the penalty phase, several witnesses who knew Mungin while he was growing up testified that he was trustworthy, not violent, and earned passing grades in school. Mungin lived with his grandmother from the time he was five, but Mungin left when he was eighteen to live with an uncle in Jacksonville. An official from the prison where Mungin was serving a life sentence for the Tallahassee crime testified that Mungin did not have any disciplinary problems during the six months Mungin was under his supervision. Harry Krop, a forensic psychologist, testified that he found no evidence of any major mental illness or personality disorder, although Mungin had a history of drug and alcohol abuse. Krop said he thought Mungin could be rehabilitated because of his normal

life before drugs, his average intelligence, and his clean record while in prison.

The jury recommended death by a vote of seven to five. The trial judge followed the jury's recommendation and sentenced Mungin to death. In imposing the death penalty, the trial judge found two aggravating factors: (1) Mungin had previously been convicted of a felony involving the use or threat of violence to another person; and (2) Mungin committed the capital felony during a robbery or robbery attempt and committed the capital felony for pecuniary gain. The trial judge found no statutory mitigation and gave minimal weight to the nonstatutory mitigation that Mungin could be rehabilitated and was not antisocial.

Id. (footnotes omitted).

## VII.   GROUND ONE

### Ground One: Ineffective Assistance of Counsel/Guilt Phase[8]

### A. Voir Dire (Batson v. Kentucky, 476 U.S. 79 (1986))

Petitioner claims Assistant Public Defender Charles G. Cofer performed deficiently when he accepted the jury without objection even though the state struck Helen Galloway, an African American female, on the basis of race.[9]

---

[8] The List and its Index of Claims were not updated to correspond with the Second Amended Petition and as a result, are confusing at best.  For ease of reference, the Court generally adopts the organization and summation of the claims utilized in the Response (Doc. 31), but, in an effort to somewhat simplify and clarify the claims, the Court will paraphrase some claims and related subclaims.

[9] Charles G. Cofer, currently the Public Defender for the Fourth Judicial Circuit, was formerly an Assistant Public Defender and a Duval County Judge.

12

Second Amended Petition at 64.   Petitioner contends the state's use of a peremptory strike to remove Mrs. Galloway was demonstrably pretextual.   Id. Petitioner argues that due to defense counsel's deficient performance, Petitioner's right to equal protection under Batson was violated and he was unable to have the claim considered on direct appeal due to counsel's deficient performance, in violation of the Sixth Amendment and the standard set forth in Strickland.   Id.   Petitioner contends counsel's failure to properly preserve his Neil[10] objection prejudiced Petitioner, causing the issue not to be preserved for appeal.   Id. at 66.

Petitioner raised his claim of ineffective assistance of counsel in his Consolidated Amended Motion to Vacate Judgments of Conviction and Sentence with Special Request for Leave to Amend.   Ex. FF at 22-30.   The circuit court denied any hearing on the claim, finding the record refutes the allegations.   Id. at 411.   Thereafter, the court denied post-conviction relief. Ex. HH at 203-204, 209.   Petitioner appealed, and the FSC found the following:

> At the Huff[11] hearing, the State argued that Mungin
> was not prejudiced by trial counsel's failure to object

---

10 State v. Neil, 457 So. 2d 481 (Fla. 1984) (claiming the trial court erred in denying an objection and motion to strike, improperly allowing the state to exercise its peremptory challenges to exclude blacks from the jury).

11 Huff v. State, 622 So. 2d 982 (Fla. 1993) (per curiam) (the trial court undertakes a Huff

> because the underlying claim was meritless.   After
> reviewing the record of the voir dire, we conclude that
> the trial court did not abuse its discretion in granting
> the State's peremptory challenge of juror Galloway.
> Therefore, the prejudice prong of <u>Strickland</u> is
> conclusively refuted.   <u>See</u> <u>Valle v. State</u>, 705 So. 2d
> 1331, 1335 (Fla. 1997).

<u>Mungin v. State</u>, 932 So. 2d 986, 996-97 (2006) (per curiam) (<u>Mungin</u> II).

The record demonstrates the following occurred during jury selection. The prosecutor, Bernardo de la Rionda, asked Mrs. Galloway, a venireman,[12] how she felt about the death penalty, and she responded, "I have mixed emotions."[13]   Ex. F at 379.   Later in the proceeding, the prosecutor inquired: "Mrs. Galloway, same questions.   First part -- first part of the trial, could you find the Defendant guilty if the State proves the case against the Defendant, could you find him guilty knowing that it could subject him to the death penalty?"   <u>Id</u>. at 407.   Mrs. Galloway responded yes.   <u>Id</u>.   The prosecutor then asked if the aggravating factors outweigh the mitigating factors, could

---

hearing to determine whether an evidentiary hearing is needed).

12  The Court adopts the terminology used by the state court.

13  Of note, venireman Mrs. Podejko said she had "mixed emotions on it" and venireman Mrs. Goodman said she had "mixed feelings on it."   Ex. F at 374, 389.   Venireman Mrs. Golden said she had "mixed emotions."   <u>Id</u>. at 374-75.   Venireman Mr. Newkirk said he had mixed feelings (later struck for cause because he said he could not vote for the death penalty).   <u>Id</u>. at 390, 554-55.   The state successfully peremptorily struck Podejko, Golden, and Galloway. <u>Id</u>. at 528-31.   By the time of Mrs. Goodman's selection, the state no longer had any peremptory challenges left and the trial court denied the state's challenge for cause finding mixed feelings was not grounds for disqualification.   <u>Id</u>. at 558-59.

Mrs. Galloway make a recommendation of death, and she responded yes.   Id. at 407-408.   Upon further inquiry by Mr. Cofer, Mrs. Galloway was asked about her "mixed emotions" response and whether she felt as though she could follow the law and the court's instructions on the law in terms of "weighing the statutory aggravations against mitigation."   Id. at 491.   She responded affirmatively.   Id.

When the prosecutor asked venireman Mr. Venettozzi how did he feel about the death penalty, Mr. Venettozzi responded: "I think it's mixed.   It depends on how serious."   Id. at 374.   Mr. Cofer said he could not hear the response, and Mr. Venettozzi responded: "I believe it depends on the circumstances.   I don't think I could say yes or no without knowing."[14]   Id. With regard to the prosecutor's two-pronged questions stated above, Mr. Venettozzi responded yes and yes.   Id. at 403.

The prosecutor moved to strike Mrs. Golden, a black female, for cause, the court questioned the stated cause and found she answered satisfactorily, and then the prosecutor struck Mrs. Golden peremptorily.   Id. at 529-30.   The prosecutor sought to strike Mrs. Galloway.   Id. at 531.   At this point, Mr. Cofer objected, noting that Mrs. Golden and Mrs. Galloway are black females,

---

[14] Mr. Venettozzi never used the phrase: "mixed emotions."   He offered the explanation that he believed the imposition of the death penalty depends on the circumstances.

and the prosecutor should not be allowed to exercise peremptory challenges against them.   Id. at 531-33.   Mr. Cofer asked for a Neil inquiry.   Id. at 533. The court noted for the record that Mrs. Golden and Mrs. Galloway were "the first two blacks, they are both females, the Defendant in this case is black." Id.

The prosecutor said he struck Mrs. Galloway because she stated she had mixed emotions about the death penalty, noting that he also struck Mrs. Podejko and Mrs. Golden for the same reason.   Id. at 534.   Mr. Cofer complained this was just a ruse because Mrs. Galloway responded yes to Mr. de la Rionda's standard two-line questioning.   Id. at 535.   Mr. Cofer pointed out that mixed emotions did not mean that the individual was more inclined not to support the death penalty.   Id.   The court inquired whether that had to do with race, and Mr. Cofer said it does not.   Id.   The court then asked is not the state entitled to use its peremptory challenges "against those who have mixed feelings about capital punishment?"   Id. at 536.

Mr. Cofer argued that Mrs. Galloway's responses were indistinguishable from those of Mr. Venettozzi, when he said he could impose the death penalty depending upon the circumstances.   Id. at 537.   Mr. de la Rionda countered that he had struck all three potential jurors who said they had mixed emotions. Id. at 537-38.   The court, after hearing argument, decided:

> Well, the strikes by the State have been – there is a substantial amount of record to indicate that those folks were not sure, mixed as the case may be.   But again, I don't think it has anything to do with race, particularly one of these is a white female, two of them are black females.   The reasons are racially neutral so that I will find that the State has exercised the peremptories again legitimately.

Id. at 538.

After the court listed the jurors, the court inquired, "[d]oes that agree with everybody?"   Id. at 560.   Mr. de la Rionda responded affirmatively.   Id. The court said, "[w]hether you like them or not, you agree those are the ones?" Id.   Again, Mr. de la Rionda said yes, and then the court asked Mr. Cofer if that was right, and he said yes.   Id.

Petitioner complains that his trial counsel performed deficiently in accepting the jury without re-raising his objection concerning Mrs. Galloway. This is based on the fact that in Florida, for appellate review, counsel must raise an objection prior to the jury being sworn.   See Joiner v. State, 618 So. 2d 174, 176 (Fla. 1993) (requiring trial counsel to renew an already rejected Batson challenge a second time at the conclusion of voir dire to preserve the Batson claim for appeal).   In this instance, however, the FSC found Petitioner did not meet the prejudice standard under Strickland.   Thus, even assuming Petitioner satisfied the deficient performance prong of Strickland, Petitioner

did not satisfy the prejudice prong as the court was convinced, upon review of the transcript of the voir dire, that the trial court did not abuse its discretion in granting the state's peremptory challenge of juror Galloway.   As such, in denying this claim, the court concluded Petitioner did not show this action so affected the fairness and reliability of the proceedings that confidence in the outcome is undermined.

To the extent Petitioner may be claiming counsel's failure to properly preserve the objection prejudiced Petitioner by denying him his right to an impartial jury, he is not entitled to habeas relief.[15]   Failure to renew a <u>Neil</u> challenge does not necessarily mean a jury panel was actually biased.[16] Indeed, in this instance, the state courts were convinced given the trial court's sustaining the peremptory challenge of Mrs. Galloway, there was no resulting impartial jury because the peremptory challenge was not founded upon the basis of race nor was it demonstrably pretextual.

---

[15] The thrust of Petitioner's claim is that he received prejudicially deficient performance from Mr. Cofer, "who unreasonably failed to properly preserve a meritorious <u>Batson</u> challenge."   Second Amended Petition at 75.

[16] Significantly, the jury included three African American females (Mrs. Watson, Mrs. Barnes, Mrs. Samuels) and one African American male (Mr. Combs).   Ex. F at 559-60.   <u>See</u> <u>United States v. Puentes</u>, 50 F.3d 1567, 1578 (11th Cir. 1995) (the seating of four African American jurors is not dispositive of a <u>Batson</u> claim, but it is considered a significant factor concerning paucity of the claim), <u>cert. denied</u>, 516 U.S. 933 (1995); <u>U.S. v. Ochoa-Vasquez</u>, 428 F.3d 1015, 1039-47 (11th Cir. 2005) (same), <u>cert. denied</u>, 549 U.S. 952 (2006).

Here the state court properly applied the two-pronged <u>Strickland</u> standard of review for Petitioner's claim of ineffective assistance of counsel; therefore, Petitioner cannot satisfy the "contrary to" test of 28 U.S.C. § 2254(d)(1).   As such, this Court must ask whether the court unreasonably applied that principle to the facts of Petitioner's case or premised its adjudication of the claim on an unreasonable determination of the facts.   After reviewing the trial transcript, and in particular the record of the voir dire, the Court is not convinced there was an unreasonable application or an unreasonable determination of the facts.

In order to satisfy the prejudice prong of <u>Strickland</u>, the deficient performance must be shown to have so affected the fairness and reliability of the proceedings that confidence in the outcome is undermined.   <u>See</u> <u>Mungin</u> II at 996 (citation omitted and internal citation omitted).   The FSC rejected the claim finding the prejudice prong conclusively refuted by the record.   In this instance, the state court did not unreasonably apply <u>Strickland</u> to the facts before it.   The state court applied clearly established federal law to reasonably determined facts.

The Court will not disturb the state court's decision as the determination was not unreasonable.   Deference is due to the FSC's decision as the state court's adjudication of this claim is not contrary to or an unreasonable

application of <u>Strickland</u> or based on an unreasonable determination of the facts.

Alternatively, as Petitioner has failed to satisfy the prejudice prong of <u>Strickland</u>, he is not entitled to habeas relief.   Here, Petitioner is claiming his trial attorney failed to preserve his <u>Batson</u> claim for appellate review and this failure "had an effect not on the trial itself but on Mr. Mungin's appeal." Second Amended Petition at 69.   For the proposition that the appropriate prejudice inquiry is whether there is a reasonable likelihood of a more favorable result on appeal, Petitioner relies on <u>Davis v. Sec'y for Dep't of Corr.</u>, 341 F.3d 1310, 1311 (11th Cir. 2003) (per curiam) (finding trial counsel acts in an appellate role when failing to preserve a <u>Batson</u> claim, thus requiring a showing of some likelihood of a more favorable result on appeal had appellate counsel raised a <u>Batson</u> claim).

To the extent Petitioner's claim of prejudice "rests entirely on the failure to preserve this issue for appeal[,] the claim is without merit.   <u>Agaro v. Sec'y, Fla. Dep't of Corr.</u>, No. 3:18-cv-341-J-34PDB, 2020 WL 6161469, at *8 (M.D. Fla. Oct. 21, 2020) (finding failure to establish requisite prejudice), <u>cert. of appealability denied</u>, No. 20-1444 7-C, 2021 WL 2190215 (11th Cir. March 10,

2021).[17]   The relevant prejudice inquiry is focused on trial, not the appeal, as "there is no clearly established federal law by the Supreme Court specifically addressing whether the federal court should examine the prejudice on appeal rather than at trial in a case [where an issue was raised but not properly preserved.]"   Carratelli v. Stepp, 382 F. App'x 829, 832 (11th Cir. 2010) (per curiam) (distinguishing Davis, finding the court's review was *de novo* and the standard of review decidedly different).

Assuming arguendo counsel failed to properly preserve the issue, the FSC would have had to determine whether the error constituted fundamental error "such that preservation would not be required."   Agaro, 2020 WL 6161469, at *8.   The FSC found the trial court did not abuse its discretion in granting the peremptory challenge of Mrs. Galloway.   The state court found the prosecutor's explanation made sense, in that the prosecutor consistently struck venire members who claimed "mixed emotions" about the death penalty, no matter their race.   As such, Petitioner was not prejudiced by counsel's

---

17 The Court finds the reasoning of Agaro persuasive on this point.   See McNamara v. Gov't Emp. Ins. Co., 30 F.4th 1055, 1060-61 (11th Cir. 2022) (reiterating that unpublished opinions may be cited as persuasive authority but are not binding precedent).   See Rule 32.1, Fed. R. App. P.   Throughout this opinion, in referencing unpublished opinions, the Court acknowledges that the opinions do not constitute binding precedent but serve as persuasive authority for the position at issue.

performance, even assuming counsel performed deficiently in failing to preserve the issue for appeal.   Thus, he is not entitled to habeas relief.

Moreover, in this instance, the Court is not convinced the <u>Batson</u> claim itself is meritorious.[18]   As such, there is not a reasonable probability that the Florida courts would grant relief on Petitioner's <u>Batson</u> claim, even if properly preserved and raised on direct appeal.   The prosecutor was found to have met his burden of stating a racially neutral explanation for his actions. Comparing the peremptory strike of Mrs. Galloway with the treatment of panel members who expressed similar "mixed emotions," supports the conclusion that race was not significant to the prosecutor in determining who was challenged and who was not.[19]   See <u>Miller-El v. Dretke</u>, 545 U.S. 231, 252-64 (2005) (finding the prosecution's (Dallas County District Attorney's Office) reason for striking a juror taking into consideration the whole of the voir dire

---

[18] On direct appeal Petitioner claimed the trial court erred in overruling a defense objection to the state's peremptory challenge of a black prospective juror; the FSC found the claim was not preserved for its review.   <u>Mungin</u> I at 1030 n.7.

[19] One factor gives this Court pause; after Mrs. Galloway said she had mixed emotions the prosecutor asked no follow-up questions.   Ex. F at 379.   But this turns out to be a distinction without a difference.   Mr. de la Rionda treated Mrs. Podejko, Mrs. Golden, Mrs. Goodman, Mr. Newkirk, Mr. Downer, and Mrs. Shelton similarly.   <u>Id</u>. at 374-75, 389, 395.   The record shows he treated the individuals who responded that they had "mixed emotions" similarly, without disparity based on race.   Although there was a little more of an exchange with Mr. Venettozzi, this was due to Mr. Cofer interjecting that he could not hear Mr. Venettozzi's initial response ("I think it's mixed.   It depends on how serious."), providing Mr. Venettozzi with the opportunity to elaborate on his response; however, Mr. de la Rionda, consistent with his pattern of inquiry, did not make any additional inquiry as to Mr. Venettozzi's response at that juncture.   <u>Id</u>. at 374.

testimony, implausible, noting the use of the Texas jury shuffle, contrasting voir dire questions posed to black and nonblack panel members, disparate treatment of ambivalent black venire members from ambivalent white panel members, trickery through disparate questioning concerning punishment, and finally the engagement in the systematic exclusion of blacks from juries in Dallas County).

Finally, and importantly, "[t]here is no evidence that race played any role in this case, that any juror was biased, or that it is reasonably probable a black juror would have seen the evidence differently than the white jurors" who found Petitioner guilty. Pryear v. Inch, No. 3:19cv357-MCR-MJF, 2020 WL 6587280, at *7 (N.D. Fla. Aug. 9, 2020) (footnote omitted), report and recommendation adopted by 2020 WL 6582668 (N.D. Fla. Nov. 10, 2020). Indeed, upon review of the record, there is no evidence that a biased juror actually served on the jury. See Carratelli v. State, 961 So. 2d 312, 324 (Fla. 2007) (setting forth the Florida standard). There was strong and significant evidence linking Petitioner to the crime, including the ballistics evidence that identified the gun used in the Tallahassee and Monticello shootings and found in Petitioner's room the night he was arrested, as the very same gun as used to shoot the victim in the Duval County case. Mungin II at 1000. This evidence was supported by the convincing eyewitness testimony of Ronald

23

Kirkland, who was not only able to pick Petitioner out of photographic lineup after his encounter with Petitioner but also to identify Petitioner in the courtroom as the man he saw leaving the store (where the victim was shot) carrying a bag.   Under these circumstances, it is not reasonably probable that a black juror would have seen the significant evidence differently than white jurors.

### B.   Failure to Impeach Ronald Kirkland

Petitioner claims his counsel was ineffective for failure to impeach Ronald Kirkland with critical evidence: a pending violation of probation warrant and an outstanding capias.   Second Amended Petition at 76-77. Petitioner argues this failure was significant to the defense as this witness "was the linchpin" of the state's case.   Id. at 76.

The FSC rejected the claim of ineffective assistance of counsel finding Petitioner failed to establish prejudice.   Mungin II at 998-99.   In doing so, the court reasoned:

> Even if Cofer's performance was deficient because he failed to discover and use Kirkland's probationary status as impeachment evidence, Mungin has failed to establish prejudice. Cofer attacked Kirkland's identification of Mungin on cross-examination of Kirkland, and by his cross-examination of the victim of the Monticello shooting and the eyewitness to the Tallahassee shooting, whose descriptions of the perpetrator were different from

> Kirkland's. In closing argument, Cofer argued extensively that due to these inconsistencies, Kirkland's identification could not be believed beyond a reasonable doubt. Moreover, Kirkland testified that he did not tell anyone from the State Attorney's Office that he was on probation and that he did not have any deals with the State in exchange for his testimony at Mungin's trial. Mungin does not allege that any deals were made. As for trial counsel's failure to inform the jury of the recalled warrants for Kirkland's arrest, because the warrants were not recalled until after the trial it cannot be said that counsel's performance was deficient.

Id.

Petitioner submits that this decision is an unreasonable application of Strickland, and the findings of fact are incorrect or unreasonable.   Second Amended Petition at 78.   Petitioner argues that not only was counsel deficient in his performance his performance prejudiced the case because the jurors were not informed "about Kirkland's potential for bias and motive for testifying and in becoming more 'certain' about his identification of Mr. Mungin."   Id. at 85.

The circuit court conducted an evidentiary hearing.   Petitioner's trial counsel, Mr. Cofer, testified as to his preparation for trial.   He obtained Mr. Kirkland's rap sheet pertaining to Kirkland's criminal history up to October 13, 1992.   Ex. GG at 338-39.   Mr. Cofer deposed Mr. Kirkland and inquired about his DUI offense and an offense of disorderly intoxication.   Id. at 339.

Mr. Cofer noted that non-impeachable offenses that occurred sometime in the past would not have given him reason to withdraw.  Id. at 341.  He noted there was a docket in his file that should have made him aware that Mr. Kirkland was on probation at the time he testified.  Id. at 346.  Mr. Cofer stated that probation is a permissible area to inquire about a witness.  Id. at 350.  He said the document he received from the state did not include the warrant (a capias for a violation of probation), that was issued three weeks later.  Id. at 354, 356, 359.  Mr. Cofer testified he did not know why the warrant was ultimately recalled.  Id. at 356-57.

At the hearing, Mr. Kirkland testified that the description he gave of Petitioner was a person having long hair and jeri-curls, age 28 to 32, a shorter individual, five-five to five-seven.  Id. at 456-57.  Mr. Kirkland stated he successfully completed the probation.  Id. at 465.  He attested he never discussed his probation with Mr. de la Rionda or anyone else from the State Attorney's Office.  Id.  Mr. Kirkland explained that neither the police nor the State Attorney's Office asked him if he was on probation around the time of the trial and the matter never came up at the time of trial.  Id. at 465-66.  He testified he had never been convicted of a felony and had one conviction for making a false statement.  Id.

On cross examination, Mr. Kirkland stated he never talked with Mr. de la Rionda or anyone else from the State Attorney's Office about worthless checks, he never told them he was arrested on worthless checks, and he never told anyone about the worthless checks.   Id. at 473-74.   He attested that there were never any deals regarding any cases he had previously or pending at the time of trial for his trial testimony.   Id. at 474.

The state called Mr. Cofer.   Id. at 488.   Upon inquiry, he said neither the State Attorney's Office nor the Public Defender's Office would be involved in the process to issue a warrant for a violation of probation.   Id. at 495.

Mr. Kirkland was put on probation with the Salvation Army on October 13, 1992.   Id. at 269.   On January 11, 1993, warrants issued for violating probation.   Id.   Petitioner was found guilty of murder,[20] and a few weeks thereafter the capiases for Mr. Kirkland were recalled on February 17, 1993. Id. at 270.

Upon review, the findings of fact are not incorrect or unreasonable; indeed, they are well-supported and accurate.   Furthermore, the Court is not convinced that there has been an unreasonable application of Strickland.   As noted by Respondents, even if Mr. Cofer had attempted to impeach Mr.

---

[20]  The jury found Petitioner guilty on January 28, 1993.

Kirkland about a misdemeanor violation-of-probation warrant, it would have been of negligible benefit to the defense as Mr. Kirkland did not know about the warrant, Mr. Kirkland did not tell the police or the State's Attorney's Office he was on probation, neither the State Attorney's Office nor the Public Defender's Office would be involved in the process to issue a warrant for a violation of probation, there was no evidence of a deal for Kirkland's testimony, and the warrant was ultimately withdrawn.

Based on this record, Petitioner cannot satisfy the contrary to test of 28 U.S.C. § 2254(d)(1).   The Court finds the state court's adjudication of this claim is not contrary to or an unreasonable application of <u>Strickland</u> or based on an unreasonable determination of the facts.   As such, this Court will give AEDPA deference to the state court's decision and will deny post-conviction relief.

Of import, Mr. Cofer's efforts to discredit the testimony of Mr. Kirkland did not constitute deficient performance by counsel.   It evinced sound trial strategy.   <u>Harvey v. Warden, Union Corr. Inst.</u>, 629 F.3d 1228, 1238 (11th Cir.) (noting the performance inquiry usually boils down to whether it was deficient performance or sound trial strategy), <u>cert. denied</u>, 565 U.S. 1035 (2011).   Mr. Cofer used effective measures to attack Mr. Kirkland's identification of Petitioner.   Mr. Kirkland's description of Petitioner did not

28

match the description of Petitioner by others who had seen Petitioner during other recent offenses. Counsel argued these inconsistencies cast great doubt on Mr. Kirkland's identification of Petitioner. Regarding the prejudice prong, at the evidentiary hearing, Mr. Kirkland attested that he did not tell anyone from the State Attorney's Office he was on probation, and he was adamant there were no deals with the state for his testimony. Furthermore, Petitioner has not submitted any evidence there was a deal. As for any failure to bring forth testimony concerning recalled warrants, the evidence showed the warrants were not recalled until after Petitioner's trial.

Also, "[w]hen courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger." Hardwick v. Benton, 318 F. App'x 844, 846 n.2 (11th Cir. 2009) (per curiam) (quoting Chandler v. U.S., 218 F.3d 1305, 1316 (11th Cir. 2000)). Mr. Cofer received his undergraduate degree from Duke University in 1974 and graduated from the University of Virginia School of Law in 1977. Ex. GG at 236. He was in a civil private practice from 1977 to 1980 and in January of 1980 went to the Public Defender's Office. Id. He was an Assistant Public Defender from 1980 through July of 1998, when he received an appointment to the county court bench. Id. at 235. He began handling homicide cases around 1983 to 1984, and was in the homicide unit from 1987 to 1995 or 1996,

and then he began supervising the county court operation.  Id.  There is a strong presumption that an experienced trial counsel's performance is not ineffective, and here Petitioner failed to overcome the presumption of effective performance accorded to his counsel.

"Strickland does not guarantee perfect representation, only a 'reasonably competent attorney.'"  Richter, 562 U.S. at 110 (quoting Strickland, 466 U.S. at 687) (internal quotation omitted).  Mr. Cofer's representation did not so undermine the proper functioning of the adversarial process that Petitioner was deprived of a fair trial.  Counsel's representation was effective, if not flawless.  Id. (recognizing there is no expectation that competent counsel will be a flawless strategist or tactician).   In this instance, Mr. Cofer's representation did not fall below an objective standard of reasonableness.   In short, his representation was not so filled with serious errors that counsel was not functioning as counsel guaranteed by the Sixth Amendment.   Petitioner is not entitled to habeas relief on this ground.

### C.   Failure to Elicit Testimony from Detective Conn

In this ground, Petitioner alleges that trial counsel failed to elicit testimony from Detective Christie Conn that Mr. Kirkland had told the detective at the time of the identification that he could not swear in court that the man in the photograph he had selected was the same man he saw exiting

the store.    Second Amended Petition at 85.    At the evidentiary hearing, Mr.

Cofer related that Detective Conn, in her deposition, testified that Mr.

Kirkland told Detective Conn he could not make an identification in the

courtroom "based on the photograph itself."    Ex. GG at 349.    Mr. Cofer agreed

that he could have brought that out if he had called Detective Conn in the

defense's case.    Id.    However, Mr. Cofer explained why he and his co-counsel

tactically decided, with the agreement of their client, not to do so:

> Yes.   We discussed this with Mr. Mungin, that
> as we got closer to trial it was our decision – Mr. De la
> Rionda is a very capable and very talented arguer, and
> it was our decision that unless we had something
> pretty important that we wanted to try to handle our
> case in a way so that we would reserve open and close.
> In other words, the sandwich in argument.    On
> balance, Mr. Kirkland admitted during trial to most of
> the things that we could have utilized Detective Conn
> to impeach on, but with that one exception about the
> certainty of his identification.   On balance we just felt
> at that time that it was just not worth losing open and
> close to recall Detective Conn, who was an adverse
> witness, to establish that one fact.

Id. at 275.

Petitioner did not testify at the evidentiary hearing, and there was no

testimony contrary to that offered by Mr. Cofer's concerning the tactical

decision-making by the defense team.    As noted by Mr. Cofer, through his

cross-examination of Mr. Kirkland, Mr. Cofer attacked the discrepancies and

weaknesses in Mr. Kirkland's testimony, including challenging Kirkland's description of the man leaving the store compared to Petitioner's appearance as described by others at around that time, the brevity of Mr. Kirkland's encounter with the man leaving the store, the fact that Mr. Kirkland saw the back side of the person's head, and the extended length of time it took Mr. Kirkland to pick out a picture from the photo lineup. See Ex. I at 677-85. And, of importance, upon inquiry, Mr. Kirkland said he did not remember telling Detective Conn that he could not swear in court. Id. at 685. The record shows that Mr. Kirkland admitted to the weaknesses in his identification, except he did not remember telling Detective Conn that he could not make an identification in the courtroom based on the photograph itself.

Both the circuit court and the FSC, applying the Strickland standard, addressed this ground and denied relief, finding defense counsel made a tactical decision not to call Detective Conn.   Ex. HH at 206-207; Mungin II at 999.   The circuit court found Mr. Cofer's testimony credible.[21]   Ex. HH at 206. Of course, this Court has "no license to redetermine credibility of witnesses

---

21 Of import, the trial court opined, "[t]here may not be many lawyers with the experience of dealing with homicide cases as exhibited by current county court judge and former assistant public defender Charles G. Cofer's[sic], Defendant's trial attorney whose testimony presented at the evidentiary hearing was both more credible and more persuasive than Defendant's allegations." Ex. FF at 204.   The court continued, "[t]aking the totality of evidence derived at the evidentiary hearing, this Court does not find any sufficient degree of ineffective assistance of counsel which would require reversal of Defendant's judgment and sentence." Id.

whose demeanor has been observed by the state trial court, but not by them."
Consalvo v. Sec'y for Dep't of Corr., 664 F.3d 842, 845 (11th Cir. 2011) (per curiam) (internal quotation marks omitted) (quoting Marshall v. Lonberger, 459 U.S. 422, 434 (1983)), cert. denied, 568 U.S. 849 (2012).   Since the trial court observed Mr. Cofer's testimony and found it credible, this Court will not make any redetermination as this Court must defer to the state court's findings of fact, 28 U.S.C. § 2254(e)(1), including applying deference to the trial court's credibility determination.   Gore v. Sec'y for Dep't of Corr., 492 F.3d 1273, 1300 (11th Cir. 2007), cert. denied, 552 U.S. 1190 (2008) (giving heightened deference to a credibility determination in a case on habeas review).   See Baldwin v. Johnson, 152 F.3d 1304, 1316 (11th Cir. 1998) (accepting the state court's credibility determination that counsel was credible), cert. denied, 526 U.S. 1047 (1999).

Petitioner has not rebutted the presumption of correctness by clear and convincing evidence.   28 U.S.C. § 2254(e)(1).   Thus, his claim is unavailing. Even though trial counsel ultimately waived initial closing argument, the FSC said this factor "does not demonstrate that at the time the decision was made not to call Detective Conn, trial counsel did not intend to use both the initial and final closing."   Mungin II at 999.   The defense's trial strategy, when the decision was made, was to try to preserve open and close.   Ex. GG at 347.

The FSC also reasoned, assuming arguendo deficient performance, Petitioner failed to establish prejudice, noting that the confidence in the outcome of the case is not undermined by any failure to call Detective Conn, an adverse witness, in the defense's case.   Mungin II at 999.   Recognizing the strength of Mr. Cofer's cross-examination of Mr. Kirkland and another victim, the state court concluded the second prong of Strickland had not been met.

The Court finds the state court's determination is consistent with federal precedent.   As such, the state court's decision is entitled to AEDPA deference. The state court's ruling is based on a reasonable determination of the facts and a reasonable application of the law.   In short, the state court's adjudication of the claim of ineffective assistance of counsel is not contrary to or an unreasonable application of Strickland and its progeny or based on an unreasonable determination of the facts.   Therefore, the state court's decision is entitled to deference and this ground is due to be denied.

## D.   Failure to Adequately Investigate and Present Alibi

Petitioner claims his counsel failed to adequately investigate the circumstances of his alibi, contending Petitioner had an alibi for the date in question and that "Ice" committed the crime.   Second Amended Complaint at 91-92.   At the evidentiary hearing, Mr. Cofer testified there were three potential aspects of the alibi: witnesses in Georgia, "Ice" in Jacksonville, and

34

Charlotte Dawson, the girlfriend in Pensacola.   Ex. GG at 320-21.   Mr. Cofer

ascertained that it would be difficult to identify Ice, obtain his cooperation, and

present his testimony.   Id. at 321.   Mr. Cofer was given a nickname for an

individual in Jacksonville and was told Ice hung out in the Moncrief area.   Id.

In his investigation of the circumstances to support an alibi, Mr. Cofer

testified he did "leg work up in Georgia," travelled to Pensacola with his co-

counsel, made stops in Monticello and Tallahassee, spoke with a victim of one

of the other crimes (the other victim had gone back to China), and went to an

address in Pensacola to try and find Ms. Dawson but her family no longer lived

in the dwelling.   Id. at 321-23.   Eventually, Mr. Cofer was able to locate Ms.

Dawson and defense counsel met with her.   Id. at 323.   Ms. Dawson said she

had gone target practice shooting with Petitioner and described the gun, which

matched the weapon seized from Petitioner.   Id. at 324.   Mr. Cofer said he

discussed this investigation with Petitioner.   Id.   Mr. Cofer imparted to

Petitioner that Ms. Dawson's testimony may be more harmful than helpful as

she had never admitted to the detectives that she had been target practice

shooting with Petitioner and used the small caliber semi-automatic.   Id. at

325-26.

Apparently there was confusion about the exact nature of the potential

alibi testimony, complicated by the fact that Petitioner had previously given

statements to Jacksonville homicide detectives on two occasions.   Id. at 294-95.   In one statement, he referred to an individual as "Snow."   Id. at 294.   In another statement, Petitioner called the individual "Ice."   Id.   Petitioner's stories were certainly not identical, but the gist was that Snow/Ice allegedly possessed the gun at the time of the shooting in Jacksonville, not Petitioner.

Petitioner states that he agrees with the FSC's conclusion that Mr. Cofer rendered deficient performance.   Second Amended Petition at 93.   The Court is not convinced that the FSC rendered such a finding.   Although not a model of clarity, apparently the FSC found neither deficient performance nor prejudice in any alleged failure to pursue an alibi defense.   Mungin II at 999-1000 ("The trial court concluded that Cofer's strategic decision not to pursue this defense did not result in deficient performance or prejudice.   **We agree**.") (emphasis added). [22]   Notably, in its rationale, the FSC relied almost exclusively on the fact that Petitioner failed to establish the prejudice prong regarding the claim that counsel failed to follow up on the alibi defense ("In this case, it appears that counsel was confused about the details of Mungin's

---

22 The record shows Mr. Cofer made some attempt to find Ice.   Mr. Cofer utilized the Public Defender's database to search nicknames and aliases.   Ex. GG at 296.   That method proved unfruitful.   Thereafter, he contacted investigator Mr. Blue, a former police officer, who had extensive knowledge of the black community to see if he knew anyone named Ice, but Mr. Blue did not have knowledge of an individual called Ice.   Id. at 296-97.   Mr. Cofer testified he was uncertain whether he sent someone to canvas the neighborhood, although if he had that would be reflected in his notes.   Id. at 298.

alibi defense.   However Mungin has failed to establish prejudice.").   <u>Id</u>. at 1000.   <u>See</u> <u>Brewster v. Hetzel</u>, 913 F.3d 1042, 1051-52 (11th Cir. 2019) (reviewing court may begin with either component).

Under the prejudice prong of <u>Strickland</u>, the question to be asked is whether there is a reasonable probability that, but for counsel's unprofessional errors, would the result of the proceeding have been different.   The FSC determined that any failure of counsel to follow up on the alibi defense would not have resulted in a different result.   Indeed, there was significant circumstantial evidence linking Petitioner to the crime; there was strong witness testimony placing Petitioner at the store where the victim was shot; although Petitioner presented testimony that there was an individual named Ice, there was no testimony suggesting counsel would have been able to locate Ice during the investigation or any evidence connecting Ice to the gun; and, finally, Petitioner's alibi witnesses did not establish that Petitioner could not have committed the murder.[23]   <u>Mungin</u> II at 1000.   Thus, even assuming deficient performance, Petitioner failed to establish prejudice.

---

[23] Petitioner submits that the FSC was not in a position to make credibility determinations on a cold record.   Second Amended Petition at 104.   The FSC, finding no prejudice, concluded, even accepting the testimony of the alibi witnesses, their testimony did not establish that Petitioner could not have committed the murder.   <u>Mungin</u> II at 1000 ("even assuming that the day they saw Mungin was September 16, 1990, their testimony does not provide persuasive evidence that Mungin would not have been unable to commit the murder between 1:30 and 2:00 that afternoon").   Indeed, one witness placed Petitioner in Jacksonville on September 16, 1990, the date of the shooting, and other witnesses

As the threshold standard of <u>Strickland</u> has not been met, Petitioner has failed to demonstrate a Sixth Amendment violation in that he has not shown the deficient performance prejudiced him, depriving him of a fair trial, a trial whose result is unreliable.   <u>Raheem</u>, 995 F.3d at 908.

Upon review, the state court applied clearly established federal law to reasonably determined facts.   Therefore, this Court will not disturb the state court's decision as the determination was not unreasonable and is entitled to AEDPA deference.

Petitioner has not satisfied the contrary to test of 28 U.S.C. § 2254(d)(1) as the state court relied upon the two-pronged <u>Strickland</u> standard in undertaking its review.   Furthermore, the state court's ruling is based on a reasonable determination of the facts and a reasonable application of the law. Petitioner has not demonstrated that the state court unreasonably applied <u>Strickland</u> or unreasonably determined the facts.   As such, Petitioner is not entitled to habeas relief.

---

remembered seeing Petitioner on a Sunday in September but could not provide exact dates or times.   Even giving credibility to this evidence, it would not produce an acquittal on retrial in the face of the strong contradictory evidence that placed Petitioner at the scene of the homicide and in possession of murder weapon when he was found, and the damaging ballistics evidence, including the shell casing and bullet left at the scene matching the gun found in Petitioner's home.

### E.   George Brown – <u>Brady</u>,[24] <u>Gilgio</u>,[25] and Sixth Amendment

The record shows, pretrial, the state, in Response to Demand and Demand for Reciprocal Discovery, listed George Brown and provided his address.   Ex. A at 7.   Mr. Cofer attempted to locate Mr. Brown at the address provided.   On July 14, 1992, Mr. Cofer filed a Motion for More Definite Address, which the trial court granted.   <u>Id</u>. at 195-96.

At a proceeding on January 7, 1993, the court addressed the motion:

> THE   COURT:     Motion   for   more   definite address for George Brown filed July 14th.

> MR.  COFER:     Judge,  we  don't  have  a  more definite address.

> THE   COURT:     Okay.  8465  Forrest  Street, that's all you've got?

> MR. DE LA RIONDA:  Yes, sir.  In fact, he – Mr. Cofer has already deposed the lead detective and has provided all the information he has regarding this Defendant [sic].

> THE   COURT:   I will grant the motion with the understanding if you find something, you have to tell him.

---

24  <u>Brady v. Maryland</u>, 373 U.S. 83 (1963) (to successfully sustain a <u>Brady</u> claim, a defendant must show favorable evidence – either exculpatory or impeaching, was willfully or inadvertently suppressed by the state, and the evidence was material, resulting in prejudice to defendant).

25  <u>Giglio v. United States</u>, 405 U.S. 150 (1972) (to establish a <u>Giglio</u> violation, a defendant must demonstrate the testimony was false, the prosecutor knew the testimony was false, and the statement was material).

MR. DE LA RIONDA:   Yes, sir.

THE COURT:   I can't very well make him come out of the air, I don't suppose.

Ex. V at 290.   Thereafter, the defense did not list Mr. Brown as a witness or seek a subpoena for him.   Ex. E at 258-61.

The record contains a General Offense/Incident Continuation Report from reporting Officer Detective K. D. Gilbreath.   App. 1 at 73.   The report provides:

> Detective Conn also interviewed **George Brown**, the other white male who entered the store **the same time as Kirkland**.   He stated he went into the store and took a bottle of Gatorade to the counter and then waited.   After a short time he looked around and saw the victim on the floor coughing and spitting up blood. He called 9-1-1 and then checked the registers after Kirkland was administering first aid to the victim. **He stated he did not notice anyone leaving the store as he entered.**

Id. (emphasis added).

On April 21, 2008, Petitioner filed a successive Corrected Motion to Vacate Judgments of Conviction and Sentence Pursuant to Fla. R. Crim. P. 3.851 with Request for Evidentiary Hearing.[26]   App. 2.   On August 12, 2009, the trial court conducted a Huff hearing on the motion.   App. 4, Transcript

---

[26] The Affidavits of George Brown and Charles G. Cofer are part of the record.   App. 1 at 70-72, 74-75.

attached to Appellant's Motion to Supplement the Record at 19-38.   The state

argued Petitioner did not meet the standards for newly discovered evidence,

the merits of the claims, or the alternative claim of ineffective assistance of

counsel.   Id. at 52.

The trial court succinctly described Petitioner's claim:

> Defendant contends that the State withheld material and exculpatory evidence tending to impeach the testimony of State trial witness Ronald Kirkland, in violation of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963), and Giglio v. United States, 405 U.S. 150, 153-54, 92 S. Ct. 763 (1972).   Defendant alleges that the State withheld statements of George Brown, a customer present at the store after Defendant killed Ms. Woods, which were inconsistent with Kirkland's statements regarding the discovery of Ms. Woods after she was shot, and which discredited Kirkland's identification of Defendant as the person "leaving the store hurriedly with a paper bag."   According to Mr. Brown's affidavit, his involvement at the scene was not accurately represented in the police report.

Id., circuit court's order at 134.   The court summarily denied the motion,

without an evidentiary hearing.   Id. at 130-40.   Along with denying the

claims as conclusively refuted by the record, the court also concluded that the

Petitioner was not entitled to a new trial because the evidence contained in the

affidavit was not of such nature that it would probably produce an acquittal on

retrial.   Id. at 137 (citing Jones v. State, 709 So. 2d 512, 521 (Fla. 1998) (per

curiam) (establishing a two- part test: (1) the evidence must not have been known by the trial court, the party, or counsel, and it must appear that the defendant or defense counsel could not have known of it by the use of due diligence, and (2) the evidence must be of such nature that it would probably produce an acquittal on retrial).

Petitioner appealed.   App. 5; App. 6; App. 7; App. 8.   The FSC affirmed in part, reversed in part, and remanded.   App. 9; Mungin v. State, 79 So. 3d 726 (Fla. 2011) (per curiam) (Mungin III).   The pertinent affidavits are reiterated in the decision.   Id. at 730-33.   In affirming in part on the newly discovered evidence claim, the FSC agreed with the trial court that the information provided by Brown was not of such a nature that it would probably produce an acquittal on retrial as there was significant evidence establishing Petitioner as the killer (he stole a red Escort car and was engaged in similar shootings prior to the shooting in Jacksonville, the stolen car was discovered in Jacksonville, and the shell casing and bullet left at the scene matched the gun found in Petitioner's home).   Id. at 738.   The court, however, reversed and remanded the Brady and Giglio claims for an evidentiary hearing "pertaining to Brown and the allegation that the police report was false."   Id.

The circuit court denied the Brady and Giglio claims.   App. 15.   The court conducted an extensive evidentiary hearing, receiving testimony from

42

the following witnesses: George Brown; Charles Cofer; Charles Wells; Christie Conn; Dale Gilbreath; and Bernardo de la Rionda.[27]   App. 16.   The state presented the testimony of Detective Christie Conn, the individual who interviewed Mr. Brown at the scene and took notes.   App. 15 at 85; App. 16. She attested she had been with the Jacksonville Sheriff's Office since 1980, and was a homicide detective in 1990.   App. 16 at 193.   She responded to scene of the murder of Betty Jean Woods on September 16, 1990 as part of the homicide team.   Id.   Detective Conn was in plain clothes, wearing a gun and had her badge on her belt.   Id. at 194.   She said she interviewed several individuals, including Mr. Kirkland and Mr. Brown.   Id. at 195-96.   Detective Conn took notes during her interview of Mr. Brown, provided her notes to Detective Gilbreath, and she said those notes were accurately incorporated in the homicide report.   Id.

Detective Conn attested that she was deposed by Mr. Cofer and Mr. Cofer asked her about the interview of Mr. Brown.   Id. at 196.   Detective Conn confirmed that she clearly documented what Mr. Brown said, and he told her he entered the store about the same time or at the same time as Mr. Kirkland. Id. at 197.   In her deposition testimony, Detective Conn summarized Mr.

---

27 Mr. Kirkland was deceased and found to be unavailable.   App. 15 at 83.

Brown's statement, saying he said he pulled into the store behind Mr. Kirkland, Mr. Brown went to the drink box and got a Gatorade, and he arrived at the counter about the same time as Mr. Kirkland.   Id. at 198.   Mr. Brown said he waited, looked around, saw Ms. Woods on the floor spitting up blood, Mr. Brown called 911 from the counter, he observed Mr. Kirkland and a white female administering first aid to the victim, and Mr. Brown checked the register close to the victim.   Id. at 198-99.   Mr. Brown said there was no money in the register, and he started looking for phone numbers and keys to the store so he could lock up.   Id. at 200.

Furthermore, Detective Conn testified in her deposition, Mr. Brown said he did not notice anyone leaving as he came in the store, and stated he went directly to the drink box.   Id.   Additionally, Mr. Brown did not mention seeing the car described by Mr. Kirkland.   Id.   Finally, Detective Conn testified, Mr. Brown never said that somebody bumped into him as he was going in the store. Id.   Detective Conn did not ask who pulled into the parking lot first.   Id. at 207-208.   Detective Conn confirmed that Mr. Brown never told her he brushed against someone departing the store, so Detective Conn never recontacted Mr. Brown to show him a photospread.   Id. at 211.

At the hearing, Mr. Brown testified nobody was in the parking lot when he pulled up.   Id. at 104.   He said as he went inside, somebody passed by him,

kind of bumped him, but it was not hard enough to make Mr. Brown look.   Id.

Mr. Brown proceeded to get a coke and a cake and put it on the counter.   Id.

He said he stood there for a bit and waited but the lady was not up there.   Id.

He said he went to the bathroom, looked around the store, and looked in a little

storeroom.   Id.   At this point, he saw the victim lying on the floor with a

spilled cup of water and a pill stuck to her lip.   Id. at 104-105.

Mr. Brown called 911 about the time a man came inside, and they rolled

the lady over on her back.   Id. at 105.   The police arrived shortly.   Id.   Mr.

Brown did not know whether the person who was departing the store was a

male or female, white or black, and was unable to provide any sort of

description of the person.   Id. at 105-106.   Mr. Brown said he did not touch

the cash registers or drawers.   Id. at 107.

Mr. Brown explained he never really had a chance to tell the police

officers because "there was news people and everything and the other guy was

there."   Id. at 108.   Mr. Brown recalled speaking to a male officer but did not

recall speaking to a female officer.   Id. at 109.   Mr. Brown said Mr. Kirkland

took over the conversation with the white male police officer.   Id. at 110.

When asked if he told the police he had brushed into someone on his way

into the store, Mr. Brown responded he was uncertain.   Id. at 124-25.   He

explained: "I was so nervous finding somebody shot I may not have said it."

Id. at 125.   Mr. Brown admitted that he did not see the man (Mr. Kirkland) come through the door of the store.   Id. at 144.   Mr. Brown testified a man came up behind him and asked what was going on, but Mr. Brown said he never saw two women inside the store as he was worried about the victim.   Id.

Mr. de la Rionda testified that he was unaware of Mr. Brown's version of the events that he was alone in the store until after he called 911, he was unaware that Mr. Brown claimed he encountered someone going out of the store, he was unaware that any law enforcement knew that Mr. Brown claimed he encountered someone going out of the store, and he was unaware that Mr. Brown claimed he did not touch the cash register.   Id. at 249-50.

The trial court denied the Brady claim, noting that the information was not willfully or inadvertently suppressed by law enforcement or the state. App. 15 at 87.   Neither was the trial court convinced that the evidence was material.   Id.   In denying the Giglio claim, the court remained unconvinced that Petitioner had shown Mr. Kirkland's testimony was false.   Id. at 88. Instead, the court viewed the testimony as two witnesses perceiving the events differently.   Id.   Finally, the court, assuming arguendo that Kirkland's testimony was false, held there was no showing that the prosecutor knew it was false.   Id.   Indeed, Mr. de la Rionda attested he never knew of Mr. Brown's version of the events set forth in the affidavit and the court found Mr.

46

de la Rionda's testimony credible.   Id.   Furthermore, the court found Mr.

Brown and Detective Conn corroborated Mr. de la Rionda's testimony.   Id.

The Brady and Giglio claims are fully analyzed in the FSC's opinion.

Mungin v. State, 141 So. 3d 138 (2013) (per curiam) (Mungin IV).   The court

employed the appropriate analysis under Brady and affirmed the decision of

the postconviction court, finding competent substantial evidence supporting

the trial court's finding that Petitioner failed to show the state either willfully

or inadvertently suppressed favorable evidence.   Id. at 143.   The court

highlighted the fact that Mr. Brown admitted he did not tell the police the same

facts because the other guy took over and Mr. Brown conceded he was unsure

whether he told any officer that someone had nudged him as the individual

exited the store.   Id.   The court noted both Officer Wells and Detective Conn

attested that Mr. Brown never said someone brushed up against him or that

he was the first or only person inside the store.   Id. at 145.   In affirming the

denial of post-conviction relief, the FSC found: "the record is devoid of any

evidence that the State inadvertently or willfully suppressed favorable

evidence[,]" concluding the second prong of Brady remained unsupported by

sufficient evidence.   Id.

Next, the FSC addressed whether the state knowingly presented false

testimony in violation of Giglio.   Id. at 145.   The court recognized the

requirements to establish a violation under <u>Giglio</u>.   <u>Id</u>.   Thereafter, the court discussed the evidence, particularly the fact that the prosecutor testified he had no knowledge that Brown was alone in the store with the victim until the 911 call was made or that Brown encountered someone leaving the store, nor was the prosecutor aware of any law enforcement officer who knew of such facts, nor did Brown contact the State Attorney's office.   <u>Id</u>. at 146. Acknowledging that Brown's testimony calls into question whether Kirkland could have seen Mungin leaving the store, the court rejected the claim of a <u>Giglio</u> violation because Petitioner failed to establish that the prosecutor or law enforcement knew Brown's version of the events.   <u>Id</u>.   As such, the court found Petitioner failed to present testimony establishing the first two prongs of <u>Giglio</u> (the prosecutor presented or failed to correct false testimony and the prosecutor knew the testimony was false) and affirmed the denial of the <u>Giglio</u> claim.   <u>Id</u>.

Petitioner raised <u>Brady/Giglio</u> claims and the postconviction court rejected the claims after an extensive evidentiary hearing.   In this Court's review, the Court presumes the factual determinations of the state court are correct.   Petitioner has failed to rebut the presumption of correctness with clear and convincing evidence.   28 U.S.C. § 2254(e)(1).   This Court also extends deference to the state court's credibility determinations.   After

hearing testimony, the post-conviction court made a credibility determination, finding the testimony of the prosecutor and law enforcement credible.   As noted previously, this Court will not redetermine credibility of witnesses. Consalvo, 664 F.3d at 845.

The FSC did not substitute its judgment for that of the post-conviction court, the court that heard the testimony of the witnesses and assessed the witnesses' demeanor and credibility.   Instead, the FSC affirmed the decision of the postconviction court on the Brady claim because it concluded "the postconviction court's findings are supported by competent, substantial evidence."   Mungin IV at 145 (affirming, stating "the record is devoid of any evidence that the State inadvertently or willfully suppressed favorable evidence").   The FSC also affirmed the postconviction court's denial of the Giglio claim, noting the first two prongs were not met.   Id. at 146-47.   Again, the postconviction court found Petitioner "has not shown that [the] prosecutor presented or failed to correct false testimony" and also found, assuming arguendo Kirkland's testimony was false, Petitioner "has not shown that the prosecutor knew the testimony was false."   App. 15 at 88.

This Court will give AEDPA deference to the FSC's decision as it is not contrary to or an unreasonable application of Supreme Court law or based on

an unreasonable determination of the facts. Petitioner is not entitled to habeas relief on this contention of constitutional deprivation.

To the extent Petitioner is claiming the state failed to disclose favorable evidence pertaining to Mr. Brown, the claim is without merit. Defense counsel possessed Mr. Brown's name long before trial as his name was disclosed during discovery. The defense gained additional information concerning Mr. Brown when Mr. Cofer deposed Detective Conn. Any contention that the state suppressed Mr. Brown's name or identity is unsupportable. Since defense counsel had the information, any Brady claim founded upon failure to disclose must fail. Not only was Mr. Brown's existence disclosed through discovery, and thereby no Brady violation proved, there has been no showing that the prosecutor knowingly presented any false trial testimony, and thereby no Giglio violation has been demonstrated.

In denying the Giglio claim, the FSC noted that Brown's testimony does call into question whether Kirkland could have seen Mungin leaving the store shortly after the shooting, but there was much more than just Mr. Kirkland's evidence presented against Petitioner. Indeed, there was other significant evidence that Petitioner committed the murder: "the murder weapon was found at Mungin's home days after the murder, that Mungin used this same gun to shoot two other store clerks just days before the murder, and that

50

Mungin was linked to the stolen vehicles involved in the crime spree." Mungin III at 739 (Polston, J., concurring in part and dissenting in part).

Upon review, Petitioner cannot satisfy the "contrary to" test of 28 U.S.C. § 2254(d)(1) as the state court rejected these claims based on Brady and Giglio. Moreover, Petitioner has not shown the state court unreasonably applied Brady and Giglio or unreasonably determined the facts. Finally, the record and reasonableness standard support the state court's findings.

Therefore, applying the AEDPA deference standard, Petitioner is not entitled to habeas relief on the Brady and Giglio claims. The Court concludes the FSC's decision affirming the trial court's decision on the guilt phase is not contrary to, nor an unreasonable application of controlling United States Supreme Court precedent.[28] As Petitioner has failed to demonstrate that the adjudication of the state court was contrary to or an unreasonable application of any clearly established federal law as determined by the United States

---

[28] Respondents contend Petitioner has not overcome the Brecht hurdle. Response at 72-73, citing Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (requiring a demonstration that the violation had a substantial and injurious effect or influence in determining the jury's verdict). No Brecht analysis is needed for Brady claims as the showing of materiality necessarily establishes actual prejudice under Brecht. Kyles v. Whitley, 514 U.S. 419, 435 (1995). Concerning a Giglio claim, courts may excuse Giglio violations under Brecht as harmless error. Trepal v. Sec'y, Fla. Dep't of Corr., 684 F.3d 1088, 1113 (11th Cir. 2012), cert. denied, 568 U.S. 1237 (2013). Assuming arguendo any violation, Petitioner has failed to satisfy the standard set forth in Brecht.

Supreme Court or an unreasonable determination of the facts, Petitioner is not entitled to habeas relief.

Petitioner raised a summary and unelaborated claim of ineffective assistance of counsel in his successive postconviction motion, claiming counsel unreasonably failed to develop and present Mr. Brown's information, depriving Petitioner of constitutionally adequate adversarial testing.   App. 2 at 92, 94 n.10, 99.   In a footnote, Petitioner claimed trial counsel was ineffective for failure to locate, speak to, and present evidence from Mr. Brown.   Id. at 94 n.10.

The contention of ineffectiveness is belied by the record.   The defense acquired the name of Mr. Brown when it was revealed during discovery.   The record shows Mr. Brown could not be located at the address provided and Mr. Cofer moved for a more definite address; however, the prosecutor stated on the record that he did not have a more definite address but assured the court that defense counsel would be provided one if obtained.   Apparently no more definite address was obtained.   Notably, Mr. Cofer used alternative means to obtain information regarding Mr. Brown and deposed Detective Conn, the officer who interviewed Mr. Brown at the scene.   As a result, Mr. Cofer obtained the same information the police had acquired regarding Mr. Brown

and concerning his actions and interactions at the scene of the crime.   As such, counsel did not perform deficiently.

Mr. Cofer performed well within the scope of permissible performance. His performance did not fall below an objective standard of reasonableness as he tried to locate Mr. Brown, and although that attempt proved unfruitful, he obtained significant information concerning Mr. Brown's version of the events by other means: deposing Detective Conn.   Under the circumstances presented, defense counsel's performance cannot be deemed deficient for failure to locate and speak to Mr. Brown.   Upon review, defense counsel's performance did not so undermine the proper functioning of the adversarial process that Petitioner was deprived of his Sixth Amendment right to the effective assistance of counsel.   Having failed to establish the performance prong of Strickland, Petitioner is not entitled to habeas relief on his claim of ineffective assistance of counsel.

Alternatively, to the extent the claim of ineffective assistance of counsel was addressed by the postconviction court and affirmed by the FSC, AEDPA deference is due.   App. 4 at 138 (finding the unelaborated claim of ineffective-assistance claim refuted by the record); App. 5 (Initial Brief of Appellant); App. 7 (Amended Answer Brief of Appellee); App. 8 (Reply Brief of Appellant); App. 9 (reversing and remanding only the Brady and Giglio claims).

The Court finds the state court's determination is consistent with federal precedent and is entitled to AEDPA deference.   The state court's adjudication of the claim is not contrary to or an unreasonable application of <u>Strickland</u> and its progeny or based on an unreasonable determination of the facts.   Thus, the claim of ineffective assistance of counsel is due to be denied.

## VIII.   GROUND TWO

### Ground Two: Ineffective Assistance of Counsel/Penalty Phase

#### A.   Failure to Present Mitigation

Petitioner raised and exhausted a claim that his trial counsel was ineffective during the penalty phase for failure to present mitigation evidence that Petitioner attempted to commit suicide at the age of twelve.   Ex. FF, consolidated amended motion at 36 (failure to present troubled childhood evidence in the penalty phase).   He claimed the information was withheld from the jury, affecting the outcome of the case.   <u>Id</u>.   This claim was addressed at an evidentiary hearing.   Ex. GG.   Thereafter, the postconviction court denied relief finding Mr. Cofer was aware of Petitioner's suicide attempt at age twelve, and Mr. Cofer's practice was to present the information to the mental health expert, who in this case was Dr. Harry Krop, to allow the mental health professional to incorporate the factor in mental health mitigators.   Ex. FF at 208.

Neither the postconviction court nor the FSC found this routine practice to constitute deficient performance on the part of counsel. Id.; Mungin II at 1002. Both state courts applied the two-pronged standard set forth in Strickland. Under these circumstances, Petitioner cannot satisfy the "contrary to" test of 28 U.S.C. § 2254(d)(1) as the state court rejected this ground based on Strickland. Moreover, Petitioner has not shown the state court unreasonably applied Strickland or unreasonably determined the facts. See Second Amended Petition at 120-26. Finally, the record and reasonableness standard support the state court's findings.

The record demonstrates that Mr. Cofer testified at a postconviction evidentiary hearing on June 25, 2002. He attested he obtained a medical report or hospital records from Georgia concerning Petitioner's suicide attempt and hospitalization at the age of twelve. Ex. GG at 298-300. Mr. Cofer said he was aware of this hospitalization when he represented Petitioner. Id. at 300-301. When asked whether he presented the information to the jury during the penalty phase, Mr. Cofer responded: "[m]y typical method of handling that would have been to submit that information to any mental health professional that had been taken on to examine Mr. Mungin for penalty phase purposes." Id. at 301. Mr. Cofer explained that he found putting on a record by calling someone down from a hospital to explain various entries

would not be as effective as having a mental health professional review the records, distill them, and then incorporate that information into their penalty phase testimony.   Id. at 301-302.   In this instance, counsel utilized Dr. Krop's expertise.   Id. at 302-303.   Mr. Cofer said he would give Dr. Krop a very detailed folder with the original documents or source documents and obtain his opinion.   Id. at 303.

The postconviction court found, "Defendant has not established that Judge Cofer's routine practice of presenting mental health mitigation evidence was error.   Ex. FF at 208 (citing Strickland).   The FSC reviewed this contention, noting this was not a case where counsel failed in his duty to prepare for the penalty portion of a capital case.   Mungin II at 1002.   Indeed, Mr. Cofer's testimony showed he investigated potential mental health mitigation and made "an informed strategic decision well within professional norms" to submit the mental health information to the expert, who ultimately concluded that Petitioner did not suffer from any major mental illness or personality disorder.   Id.

The FSC went on to find, even assuming deficient performance, there was no prejudice as the suicide attempt took place twelve years before the murder, and there was no evidence of any suicidal tendencies as an adult or evidence contradicting Dr. Krop's expert opinion concerning Petitioner's

mental state.   Id. at 1002-1003.   Finally, the court pointed to some notations in the hospital records regarding whether there was a suicide attempt or whether two Valium tablets were taken to aid sleep.[29]   Id. at 1003.

Regarding the performance prong of Strickland, "[a]n attorney's actions are sound trial strategy, and thus effective, if a reasonable attorney could have taken the same actions."   Harvey, 629 F.3d at 1243.   A reasonable attorney could have concluded that providing the relevant information to the mental health expert to review, distill, and present in the most persuasive fashion at the penalty phase was the best course.   Mr. Cofer testified he had developed an affinity for Dr. Krop and worked with him on many cases.   Ex. GG at 303. Mr. Cofer undertook an investigation, found the medical records, and turned those records over to Dr. Krop so that he could incorporate them in mental health mitigators.[30]   Id. at 334.   As the bounds of constitutionally effective

---

[29] This last information seems more in character with patient history rather than a diagnosis from a medical professional and is not really persuasive.   See Second Amended Petition at 124-25.   Nevertheless, Petitioner did not otherwise establish prejudice.

[30] The record shows counsel thoroughly prepared for the penalty phase.   Mr. Cofer undertook an investigation and turned the records over to the mental health expert, Dr. Krop. As such, the record developed by Petitioner "does not show that the state court's determination that his counsel's performance was not unreasonable 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'"   Gavin v. Comm'r, Ala. Dep't of Corr., No. 20-11271, 2022 WL 2752366, at *13 (11th Cir. 2022) (quoting Richter, 562 U.S. at 103). Accordingly, the state court's application of clearly established federal law was not objectively unreasonable.

assistance of counsel are very wide, Mr. Cofer's actions were within the broad range of reasonably competent performance under prevailing professional standards.   Failure to meet the deficiency prong of <u>Strickland</u> is fatal to Petitioner's claim of ineffective assistance of counsel.   <u>See</u> <u>Reaves v. Sec'y, Fla. Dep't of Corr.</u>, 872 F.3d 1137, 1151 (11th Cir. 2017), <u>cert. denied</u>, 138 S. Ct. 2681 (2018) (failure to satisfy one <u>Strickland</u> component is fatal to the claim).

The penalty phase record shows Mr. Cofer put on extensive evidence concerning Petitioner's childhood and upbringing, including testimony of Hagar Mungin, Petitioner's grandmother; cousins Angie Jacobs, an employee of the Board of Education, and Clifton Jerome Butler, Jr., an employee of Gilman Paper Company; Tracy Black, the mother of his child; Deputy Sheriff Malcom Anthony Gillett, a childhood friend; police officer Freddie L. Green, Jr., childhood friend; Ralph Pierce, assistant school superintendent and former coach; Gene Brewer, assistant superintendent for Harris County, Georgia and Petitioner's former teacher and coach; and Dr. Krop.   Ex. P at 1137-75, 1183-1206.   In hindsight, Mr. Cofer could have done things differently or done more, but that is not constitutionally compelled.   Although every attorney may not have chosen the same approach or strategy, Mr. Cofer's performance did not so undermine the proper functioning of the adversarial process.   Indeed, the close seven-to-five vote, despite the strength of the evidence of Petitioner's

crime spree using the same gun, demonstrates Mr. Cofer's strategy and performance were sound.

Concerning the prejudice prong, as found by the FSC, any failure of counsel to directly present Petitioner's suicide attempt at the age of twelve to the jury did not "so affect[ ] the fairness and reliability of the proceedings that confidence in the outcome is undermined." Mungin II at 1003 (citation omitted). The suicide attempt was remote, occurring twelve years prior to the murder, and Dr. Krop, the trusted mental health expert, found Petitioner did not suffer from any major mental illness or personality disorder, allowing defense counsel to persuasively argue that Petitioner was capable of being rehabilitated and should be spared from a recommendation of death. Ex. GG at 302. Again, the jury's close seven-to-five vote evinces the quality of the penalty phase presentation of the defense and demonstrates that the strategy chosen was effective, if not ultimately successful.

The Court finds the state court's determination is consistent with federal precedent. The state court's decision is entitled to AEDPA deference. The state court's ruling is based on a reasonable determination of the facts and a reasonable application of the law. In short, the state court's adjudication of the claim is not contrary to or an unreasonable application of Strickland and its progeny or based on an unreasonable determination of the facts.

Therefore, the state court's decision is entitled to deference and this claim is due to be denied.

**B.   Failure to Object to Improper Argument**

In closing argument during the penalty phase of the proceedings, the prosecutor, Mr. de la Rionda, argued that the jurors should not have sympathy for the grandmother and then not recommend death: "[j]ust because he has a nice grandmother who took care of him and tried to raise him up as a good person, --- unfortunately he didn't turn out to be a good person, -- that doesn't mean that you feel sorry."   Ex. Q at 1222.   Continuing in this vein, Mr. de la Rionda argued:

> Just as a father or a mother may bring a dog home to their child, -- that dog may be a pit bull.   As a puppy that dog is a wonderful dog.   He plays with all the kids.   He's great.   Everybody loves him. Later on when that puppy dog gets big he becomes vicious and he starts biting people and he starts biting other dogs and kills other dogs, -- he starts biting other kids and he starts biting dogs, other dogs.   He even kills dogs.   That dog is the puppy who was a beautiful dog and nobody dreamed it would turn out to be the way it did.

Id. at 1222-23.

Mr. de la Rionda stated that simply because Petitioner was a good person as a youngster does not outweigh the aggravating factors in the case.   Id. at 1223.   Mr. de la Rionda argued that the aggravation outweighed the

mitigation in this case.   Finally, he urged the jury not to feel sorry "because of his grandmother or aunt[.]" Id.

Petitioner contends the prosecutor's "pit bull" argument analogizing Petitioner to a dog was clearly objectionable and counsel's failure to object allowed this inflammatory argument to denigrate the proceeding, resulting in substantial prejudice and unfairness.   Second Amended Petition at 126-27. As such, Petitioner argues Mr. Cofer was duty-bound to object to the "pit bull" argument as the prosecutor was attempting to inflame the jury and make their penalty phase decision based on an emotional response.   Id. at 127.

The record shows Mr. Cofer did not contemporaneously object to the "pit bull" argument, but in his closing argument, he countered the prosecutor's argument:

> Mr. de la Rionda made reference to what you do to a dog if a dog is once nice in its life and then turns out to be mean.   I would hope that each of you in your deliberations are going to be guided by a standard which is fairly higher than that which you would judge a dog by.

Ex. R at 1229-30.

After acknowledging the jury selection process and the jurors' contention that they had the ability to follow the law, weighing mitigation against the aggravation, id. at 1230-32, Mr. Cofer, in terms of mitigation, noted that

Petitioner was a well-mannered child raised by his grandparents and was a participating member in school activities who did not engage in any juvenile delinquency.   Id. at 1238-39.   Mr. Cofer said Petitioner, in his late teens, moved to a difficult urban environment and began using street drugs, leading up to the events "surrounding this shooting."   Id. at 1239.   Mr. Cofer argued that Petitioner had committed antisocial acts, but he was not antisocial through and through.   Id. at 1240.   In support of this contention, Mr. Cofer relied on Dr. Krop's expert opinion that Petitioner had good rehabilitation prospects and would not be a management problem.   Id. at 1241.

Petitioner exhausted the claim of ineffective assistance of counsel by raising it in his consolidated amended postconviction motion as claim III.   Ex. FF at 30-33.   The postconviction court summarily denied the claim.   Ex. HH at 203-204.   On appeal of the denial of the claim, the FSC affirmed, finding the claim to be without merit in that the isolated comment was not objectionable and there was no ineffectiveness in failing to object.   Mungin II at 997.

Petitioner avers there was an unreasonable application and determination of facts by the state court because the remarks were objectionable, improper, and subject to mistrial.   Second Amended Petition at 127-28.   He contends reasonably effective counsel would have objected to the

comments, the objection would have been sustained, the improper comments would have been stricken, or mistrial would have been granted.   Id. at 128.

The record shows the state court relied on the Strickland standard; therefore, Petitioner cannot satisfy the "contrary to" test of 28 U.S.C. 2254(d)(1).   The Court must ask whether the state court unreasonably applied that principle to the facts or premised its adjudication of the claim on an unreasonable determination of the facts.

As noted previously, the state court referenced the applicable two-pronged Strickland standard as a preface to addressing Petitioner's claim of ineffective assistance of counsel, and the court employed the two-pronged test when addressing this particular claim.   The decision is based on a reasonable determination of the facts and a reasonable application of the law.   There is a reasonable basis for the state court to deny relief, and this decision will be given deference.   In short, the state court's adjudication of the claim is not contrary to or an unreasonable application of Strickland and its progeny or based on an unreasonable determination of the facts.   Therefore, the state court's decision is entitled to AEDPA deference and Petitioner is not entitled to relief on this ground.

Alternatively, assuming arguendo the remarks were objectionable, the question remains whether counsel performed deficiently by conduct that is

outside the broad range of competent performance under prevailing professional norms and whether this alleged deficient performance so affected the fairness and reliability of the proceedings that confidence in the outcome is undermined.  <u>Strickland</u>.  The record shows Mr. Cofer did not object to the prosecutor's "pit bull" argument but, in his closing argument, Mr. Cofer specifically addressed, challenged, and countered the prosecutor's argument. Even assuming the FSC erred in concluding that this isolated argument was not objectionable, the Court is not otherwise convinced that counsel's failure to object amounted to deficient performance when defense counsel chose a different and reasonable course to attack the prosecutor's argument.[31]

"Failure to object to improper prosecutorial argument rarely amounts to ineffective assistance of counsel[.]" <u>Lara v. State</u>, 528 So. 2d 984, 985 (Fla. 3rd DCA 1988) (per curiam).  <u>See</u> <u>Miller v. State</u>, 161 So. 3d 354, 382 (Fla. 2015) (per curiam).  The prosecutor's comments must be so inflammatory that they would have influenced the jury to reach a more severe verdict than it would have otherwise.  <u>Walls v. State</u>, 926 So. 2d 1156, 1167 (Fla. 2006) (per curiam). Here, the comments at issue were brief and not so prejudicial as to vitiate the

---

[31] It is extremely doubtful that the comments comparing Petitioner to a cute puppy that grew into a vicious pit bull to argue past character was not a determinant of present character was impermissible.  <u>See</u> <u>Reese v. Sec'y, Fla. Dep't of Corr.</u>, 675 F.3d 1277, 1293 (11th Cir.) (finding that because evidence of the petitioner's past character was presented to the jury, the prosecutor was entitled to make this type of argument), <u>cert. denied</u>, 568 U.S. 905 (2012).

entire proceeding.   Miller, 161 So. 3d at 382.   It "is not enough that the prosecutors' remarks were undesirable or even universally condemned." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Darden v. Wainwright, 699 F.2d 1031, 1036 (11th Cir. 1983)).

The record demonstrates counsel appealed to the jury's application of a higher standard than that which would be employed to judge a dog.   Mr. Cofer argued Petitioner had led a well-mannered life until he moved to a difficult urban neighborhood, fraught with street drugs, leading Petitioner to undertake antisocial acts, although Petitioner was not antisocial through and through.   Mr. Cofer relied on Dr. Krop's expert testimony to support this contention.   As such, Mr. Cofer appealed to the jury's sensibilities that Petitioner was essentially a decent human being with good rehabilitation prospects, as evidenced by his years of decent conduct and conformed behavior throughout most of his life.

No doubt the use of offensive and demeaning terminology to describe a defendant is both undesirable and condemned, but the brief comments in the "pit bull" argument did not so infect the penalty phase proceeding with unfairness as to make the result a denial of due process.   Thus, "defense counsel was able to, and did, directly rebut these contentions during his closing argument."   Medina v. Sec'y, Dep't of Corr., 733 F. App'x 490, 495 (11th Cir.

2018) (per curiam).   Mr. Cofer, by challenging the prosecutor's offensive argument through his own closing argument, turned the prosecutor's closing argument against him, "by placing many of the prosecutor['s] comments and actions in a light that was more likely to engender strong disapproval than result in inflamed passions against petitioner."   Darden, 477 U.S. at 182.

Under these circumstances, defense counsel's representation did not fall outside the range of reasonably professional assistance in failing to object. Mr. Cofer addressed and rebutted the prosecutor's contentions during closing argument.   Furthermore, there is no reasonable probability that the outcome of the proceeding would have changed if defense counsel had objected.   See Reese; Darden.   The record demonstrates that Petitioner's counsel's actions were within the broad range of reasonably competent counsel under prevailing professional norms.   There is no reasonable probability that, if counsel had acted as Petitioner suggests, the result of the proceeding would have been different.

### C.   Failure to Properly Prepare Witness Glenn Young

Petitioner claims his counsel was ineffective for opening the door to damaging testimony that life does not always mean life and there is a possibility of early release if Petitioner is sentenced to life.   In short, Petitioner contends due to counsel's deficient performance, Glenn Young's

testimony minimized the significance of a life sentence, giving the jurors the impression that even with a 25-year mandatory term, Petitioner might serve less than 25 years.   Second Amended Petition at 132.

The FSC rejected the claim of ineffective assistance of counsel, finding Petitioner cannot demonstrate prejudice under <u>Strickland</u>.   <u>Mungin</u> II at 998. Thus, the rejection of the claim was not contrary to clearly established Federal law as the state court applied the appropriate two-pronged <u>Strickland</u> standard of review.   Next, the Court must inquire as to whether there was an unreasonable determination of clearly established Federal law.   Notably, "regardless of the specter of early release on Mungin's prior convictions, the jury knew that a life sentence in this case meant Mungin would serve at least twenty-five years in prison."   <u>Mungin</u> II at 998.   This is simply not an unreasonable determination of Federal law or the facts.

The record demonstrates the following.   At the outset of voir dire, the trial court instructed the panel:

> If he is found guilty of first degree murder, the sentence must be death in the electric chair or life imprisonment without the possibility for parole for twenty-five years.   Those are the only two penalties available for that offense.
>
> . . . .

> This advisory sentencing recommendation may be by the majority vote of the jury and thereafter I would sentence Anthony Mungin to death or life imprisonment without the possibility of parole for twenty-five years.

Ex. F at 301-302.

During the penalty phase, the circuit court reiterated, "[t]he punishment for this crime is either death or life imprisonment without the possibility of parole for 25 years."   Ex. N at 1123.   The court instructed the jury concerning reaching an advisory sentence and the jury's choices being a recommendation of a sentence of death or life imprisonment without possibility of parole for 25 years.   Ex. S at 1249-51.

The Advisory Sentence too reflects that the advisory sentence selections provided to the jury were either life imprisonment without the possibility of parole for twenty-five years or death.   Ex. T at 382, 1256.[32]   The jury selected the advisory sentence of the death penalty by a vote of 7 to 5.   Id. at 1256.

Thus, the record shows that the jury was repeatedly provided with clear and specific instructions that Petitioner would serve at least twenty-five years in prison if the jury gave an advisory sentence of life without the possibility of parole for 25 years and the court chose to adopt the jury's recommendation.

---

32 Exhibit T is split and found in two different parts of the record.

Therefore, Petitioner has not established prejudice as Young's testimony that life does not always mean life did not so affect the fairness and reliability of the proceedings that confidence in the outcome is undermined.

Although not all of Young's testimony was favorable concerning what it meant to be sentenced to prison for life, there is no question that the circuit court's repeated instructions to the jury ensured that the jury well understood that in the present case Petitioner would serve at least 25 years in prison if the choice of an advisory sentence of life were selected.

The record also shows that Mr. Cofer called Mr. Young in the penalty phase proceedings and Young confirmed Petitioner was already serving a life sentence with a three-year minimum mandatory sentence.   Ex. P at 1177. Immediately after Mr. Young offered that life does not really mean life, Mr. Cofer asked the clarifying question as to whether that really only applies to inmates "who were in the system prior to October 1 of 1993" and Mr. Young responded yes.   Id. at 1178.   Thus, defense counsel eliminated much of the detrimental effect of Mr. Young's observation.

Additionally, on cross-examination, Mr. Young explained: "[a]n inmate sentenced to a 25-year mandatory on a life sentence, those are the inmates you see doing more of the time."   Id. at 1180.   Mr. Cofer also asked additional questions on re-direct to make certain that the jury heard that eligibility for

conditional release and controlled release only applied to sentences for a term of years, not a life sentence.   Id. at 1181.

Thus, although not all of Young's testimony may be considered favorable to Petitioner, Mr. Cofer was able to reduce any possible negative impact of Young's testimony by asking questions which distinguished inmates in the system prior to October 1 of 1993 and those like Petitioner, distinguished life sentences in non-death penalty cases from life sentences in death penalty eligible cases, and distinguished eligibility for release in term of years sentences from life sentences.

As noted by the FSC, any specter of early release on Petitioner's prior convictions was distinguished from any sentence he may be eligible to receive and serve in the Duval County case.   Therefore, any deficiency on the part of counsel for calling Young in the penalty phase did not deprive Petitioner of a fair proceeding.

In conclusion, Petitioner cannot satisfy the "contrary to" test of 28 U.S.C. § 2254(d)(1).   Furthermore, he has not demonstrated that the state court unreasonably applied Strickland or unreasonably determined the facts.   As such, the state court's decision is entitled to deference.   Petitioner is not entitled to habeas relief on this claim of ineffective assistance of counsel in the penalty phase.

70

## IX.   GROUND THREE

**Ground Three:   Conflict of Interest**

The claim as stated in the Second Amended Petition is: "[t]he Duval County Public Defender's Office had an actual conflict of interest based on prior and simultaneous representation of key state witness Kirkland, in violation of Mr. Mungin's Sixth Amendment Right to conflict-free counsel."   Second Amended Petition at 136.   Petitioner submits that the prior and simultaneous representation of both Petitioner and Mr. Kirkland was an actual conflict, relying on Cuyler v. Sullivan, 446 U.S. 335 (1980) and Halloway v. Ark., 435 U.S. 475 (1978).   Second Amended Petition at 137.   Alternatively, Petitioner claims Mr. Cofer was ineffective as counsel under Strickland as he had a duty to avoid conflicts of interest.   Id. at 138-39.

Petitioner raised a similar claim in his consolidated amended post-conviction motion, claiming a conflict and a "very serious breach of ethics by Mr. Mungin's counsel" for failure of the Public Defender's Office to disclose the simultaneous representation of Petitioner and the sole eyewitness, Mr. Kirkland.   Ex. FF at 6-9 ("The Duval County Public Defender[']s Office had an actual conflict of interest that should have been disclosed and the Public Defender[']s Office should have withdrawn from Anthony Mungin's Case.").   The circuit court conducted an evidentiary hearing and addressed the issue.

71

Ex. GG.   Petitioner's post-conviction counsel, Ken Malnik, inquired as to whether Mr. Cofer filed a motion asking the state to produce "Brady material." Id. at 242.   Mr. Cofer said he had requested the names of any witnesses who have charges pending in this or any other jurisdiction and whether the charges have been formally filed or not.   Id. at 242-43.   On December 21, 1992, the court granted the motion.   Id.   Mr. Cofer had no recollection that the state provided any criminal history as to Mr. Kirkland or as to any witness.   Id. at 245.   Mr. Cofer repeated that the State Attorney's Office had not provided him with a criminal history as to Mr. Kirkland.   Id.

When asked if during his representation of Petitioner, had Mr. Cofer been aware that Mr. Kirkland had been represented by the Public Defender's Office for Duval County, Mr. Cofer responded that he did not have a recollection of having been aware that there had been a case which came up during the pendency of Petitioner's case where the Public Defender's Office represented Mr. Kirkland.   Id. at 246.   Mr. Cofer stated he may have been aware through his own record check that the Public Defender's Office had represented Mr. Kirkland in the past as Mr. Cofer had some recollection that Mr. Kirkland had arrests for disorderly intoxication and possibly a DUI during a time prior to Petitioner's arrest.   Id. at 247.   However, Mr. Cofer testified he could not state with certainty whether he knew whether the Public

Defender's Office had represented Mr. Kirkland in the past.   Id.   Mr. Cofer did not recall having disclosed to Petitioner "the possibility that Mr. Kirkland may have been represented by the Fourth Judicial Circuit."   Id. at 248.

Mr. Cofer explained that the Public Defender's Office had no uniform policy as to when the Office would withdraw merely because the Office had touched upon a witness or victim's case.   Id. at 248-49.   The Office would look at the date or time period of representation of the individual, the type of offense, and the remoteness of the representation.   Id. at 248.   The Office would also look to whether it was an impeachable offense, the extent of the representation, and the severity of the offense.   Id. at 249.   Mr. Cofer offered, when a person is "involved more recently or with a more serious type of charge, certainly when the charges arise during the same period of time that the homicide case is going, that is a major situation that you have to address with the client."   Id.

As far as the effectiveness of counsel's preparation, Mr. Cofer attested that he took Mr. Kirkland's deposition in June of 1992.   Id. at 249.   The state had not provided a criminal history of Mr. Kirkland.   Id. at 250.   It was Mr. Cofer's practice and habit to make his own request to get a copy of the criminal history record.   Id.   Mr. Cofer did not know whether he had done so prior to Mr. Kirkland's deposition.   Id. at 251.   Upon further inquiry and being shown

a document, Mr. Cofer said he did request the criminal history of Mr. Kirkland. Id. at 252.   The packet received contains a docket from September 26, 1992, arrests for three misdemeanor worthless check cases.   Id. at 253.   The record showed the Public Defender's Office was appointed and the cases disposed of on October 13, 1992 with pleas of guilty with the adjudication of guilt withheld by the court.   Id. at 254.   Mr. Cofer stated the cases were occurring simultaneously to counsel's representation of Petitioner.   Id.   Mr. Cofer did not recall reviewing the information.   Id. at 254-55.   He said had he known, he would have disclosed the information to Petitioner and discussed the alternatives with Petitioner.   Id. at 255.   Mr. Cofer explained that the Public Defender's Office would be reluctant to withdraw from a homicide case in which the conflict was based on misdemeanor cases.   Id. at 255-56.   Mr. Cofer noted the ethical concern and consideration by the attorneys and the desire to consult and advise the client.   Id. at 256-57.

Of interest, Mr. Cofer testified that in preparation for the postconviction evidentiary hearing, he checked the docket and when Mr. Kirkland was sentenced on October 13, 1992, he was placed on 90-days probation.   Id. at 259.   In all three cases, a violation of probation warrant was issued on January 11, 1993.   Id. at 260.   Mr. Cofer went to trial on Petitioner's case about two weeks later, around January 25 or 26, 1993.   Id.

Mr. Cofer attested when he deposed Kirkland, he admitted to a disorderly intoxication and DUI case; however, the deposition was taken before the September 26, 1992 arrest.   Id. at 261.   Mr. Cofer did not believe he had inquired as to Mr. Kirkland's representation.   Id. at 261-62.

Mr. Cofer testified, based on the records it did not appear that Mr. Kirkland was taken into custody on the warrants, and the capiases were recalled in a February 17, 1993 post.   Id. at 269-70.   Mr. Cofer had no recollection of using the case-tracking program to find out if Mr. Kirkland had been represented by the Public Defender's Office.   Id. at 288.

As to the viability of impeachment material from the worthless check offenses, Mr. Cofer attested that the worthless checks, particularly in light of the withhold of adjudication, would not be impeachable.   Id. at 349. However, the fact that Mr. Kirkland was on probation was a matter open to inquiry, but Mr. Cofer had no recollection of Mr. Kirkland being on probation. Id. at 349-50.

Mr. Cofer testified that had he known that Mr. Kirkland was being represented by the Public Defender's Office at the time of Petitioner's representation, Mr. Cofer would have consulted with Petitioner and discussed whether or not he would waive the conflict, or the Public Defender would conflict out of Petitioner's representation.   Id. at 367A.   Mr. Cofer believed

the source of the conflict came potentially from the fact that the Public Defender's Office represented Mr. Kirkland at the time he entered his plea and was placed on probation, not that he was on probation or that a warrant had issued.  Id.  Mr. Cofer stated he would not have pulled any punches for someone charged with first degree murder simply because he had to cross-examine an individual who had been represented by the Public Defender's Office at a first appearance hearing and sentencing on a worthless check.  Id. at 368.  Mr. Cofer said apparently he had the information that Mr. Kirkland was on probation, and if Mr. Cofer had made the connection that Mr. Kirkland had a probation warrant, Mr. Cofer would have cross-examined Mr. Kirkland about it.  Id. at 369.

Mr. Kirkland testified at the hearing.  He did not recall whether the Public Defender was appointed to represent him on the worthless check charges.  Id. at 464.  He recalled successfully completing his probation.  Id. at 465.  He was never aware that there had been a warrant issued for violating the probation.  Id.  He never discussed being on probation with the prosecutor or anyone in the State Attorney's Office.  Id.  No one from that office ever asked if Mr. Kirkland was on probation.  Id. at 466.  It did not come up with anybody at the time of trial.  Id.  Mr. Kirkland stated he did not tell the State Attorney's Office or anyone about the worthless checks before

76

he testified.   Id. at 473-74.   He confirmed there were no deals at the time he testified regarding any cases he had previously or pending.   Id. at 474.

In denying the consolidated postconviction motion, the circuit court found Mr. Cofer "more credible," noting "[t]here may not be many lawyers with the experience of dealing with homicide cases as exhibited by current county court judge and former assistance public defender Charles G. Cofer[.] Ex. HH at 204.   As such, the court did not "find any sufficient degree of ineffective assistance of counsel which would require the reversal of Defendant's judgment and sentence."   Id.   In sum, the circuit court rejected the conflict-claim after the evidentiary hearing, finding Petitioner failed to demonstrate an actual conflict of interest existed that adversely affected counsel's representation.   Id. at 205.

Petitioner also raised a claim that counsel failed to properly impeach Mr. Kirkland concerning a violation of probation warrant and failed to attack his credibility by showing an interest in cooperating with the state concerning a violation of probation warrant.   Id. at 206.   The circuit court also rejected this claim, finding neither prong of Strickland had been met and the claim meritless.   Id.

On appeal of the denial of the post-conviction motion, the FSC found that Mr. Cofer's testimony supported the trial court's finding that no actual conflict

existed.   Mungin II at 1001-1002.   The evidentiary hearing testimony revealed that Mr. Cofer had deposed Mr. Kirkland and was aware of some of his prior criminal history, but Mr. Cofer did not recall whether he checked the Public Defender's database or whether he actually knew or made the connection that Mr. Kirkland had been represented by the Public Defender's Office.   Further, Mr. Cofer attested had he known of any simultaneous representation, he would have disclosed that to Petitioner.   Thus, the court found counsel's allegiance was not divided and there was no actual conflict.

Alternatively, the FSC found, even assuming an actual conflict did exist, Mr. Cofer's representation was not adversely affected in that Mr. Cofer conducted an extensive cross-examination of Mr. Kirkland concerning his identification of Petitioner.[33]   Id. at 1002.   Furthermore, any alleged conflict did not prevent the adequate cross-examination of Kirkland as Mr. Cofer did not know or make the connection that the Public Defender's Office represented Mr. Kirkland and Mr. Cofer did not pull any punches during cross-examination.   Id.

As to Petitioner's claim that Mr. Cofer was ineffective in that he failed in his duty to avoid conflicts of interest, the Court finds no merit to this claim.

---

33 The attempt to discredit the testimony of Mr. Kirkland through cross-examination did not constitute deficient performance by counsel.   See Ex. I at 675-85.   This was sound trial strategy performed effectively.

Mr. Cofer filed a motion asking the state to produce the names of any witnesses who have charges pending in this or any other jurisdiction and whether the charges have been formally filed or not.   Although the motion was granted, the prosecutor never provided any such information to Mr. Cofer concerning Mr. Kirkland.   Indeed, the state did not provide any criminal history of Mr. Kirkland.   Although Mr. Cofer was aware that Mr. Kirkland had arrests for disorderly intoxication and possibly a DUI during a time prior to Petitioner's arrest, he did know whether the Public Defender's Office had represented Mr. Kirkland on those charges.

Mr. Cofer took the additional step of deposing Mr. Kirkland.   Of note, the arrests for worthless checks and the subsequent probation occurred after the deposition.   Mr. Cofer surmises that he eventually requested the criminal history of Mr.. Kirkland but he did not recall reviewing the information showing that the court appointed the Public Defender's Office to represent Kirkland and the cases were disposed of in October 1992.   However, Mr. Cofer said had he known, he would have disclosed the information to Petitioner and discussed the alternative courses of action with him.   Mr. Cofer simply had no recollection of using the case-tracking program to find out if Mr. Kirkland had been represented by the Public Defender's Office.

The State Attorney's Office did not provide Mr. Cofer with any information concerning the probation and the warrants.   Prior to providing his trial testimony, Mr. Kirkland did not inform the State Attorney's Office or anyone else that he had been placed on probation.   Mr. Kirkland was unaware that there were any warrants and completed his probation.

Under these circumstances, the Court is convinced that Petitioner has failed to demonstrate an actual conflict of interest existed that adversely affected counsel's representation.   Petitioner's contention that counsel's failure to properly impeach Mr. Kirkland concerning a violation of probation warrant and his interest in cooperating with the state concerning this warrant should be considered deficient performance is unavailing because Mr. Kirkland was unaware the warrants had issued; therefore, the issuance of the warrants would have had no impact on his testimony or supported any contention that Mr. Kirkland's testimony was influenced by the issuance of the warrants or some sort of deal related thereto.

The record also supports the conclusion that Mr. Cofer's allegiance was not divided.   He did not register the fact that Mr. Kirkland had been represented by the Public Defender's Office in the past or during Petitioner's proceedings.   Certainly, the record shows the state did not provide him with that information.   Although Mr. Cofer deposed Mr. Kirkland, the arrests for

the misdemeanor worthless check charges occurred after the deposition.   Mr.
Cofer attested that after obtaining some documentation, had he made the
connection and known that Mr. Kirkland was being represented by the Public
Defender's Office at the time of Petitioner's case, Mr. Cofer would have
consulted with Petitioner.   He did not take that step because he did not make
the connection.

Of great import, even assuming an actual conflict, Mr. Cofer's
representation of Petitioner was not adversely affected.   The record shows the
Public Defender's representation of Mr. Kirkland on misdemeanor offenses did
not cause Mr. Cofer any pause or restraint in his representation.   Since he
was unaware of the Public Defender's representation, it neither curtailed his
cross-examination of Mr. Kirkland nor did it effect his relationship with his
client and his ability to effectively conduct a cross-examination or otherwise
adequately represent his client.

In Reynolds v. Chapman, 253 F.3d 1337, 1342 (11th Cir. 2001), the
Eleventh Circuit explained:

> Ineffective assistance of counsel claims in the
> conflict of interest context are governed by the
> standard articulated by the Supreme Court in Cuyler
> v. Sullivan, 446 U.S. 335, 100 S. Ct. 1708, 64 L.Ed.2d
> 333 (1980). Cuyler establishes a two-part test that we
> use to evaluate whether an attorney is constitutionally
> ineffective due to a conflict of interest. To show

ineffectiveness under Cuyler, a petitioner must demonstrate: (a) that his defense attorney had an actual conflict of interest, and (b) that this conflict adversely affected the attorney's performance. See Cuyler, 446 U.S. at 348–49, 100 S. Ct. 1708.

Of importance, "[i]n order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." Cuyler v. Sullivan, 446 U.S. at 348 (footnote omitted).   In these circumstances, once this test is met, a defendant need not demonstrate prejudice as prejudice is presumed.   Strickland, 466 U.S. at 692.   Indeed, "[a] defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice[.]" Cuyler, 446 U.S. at 349.   See Zone v. U.S., No. 6:07-cv-1331-Orl-22KRS, 6:06-cr-198-Orl-22KRS, 2008 WL 552555, at *2 (M.D. Fla. Feb. 27, 2008) (not reported in F.Supp.2d) (same).

For example, a failure to cross-examine a prosecution witness or failure to challenge the presentation of arguably inadmissible evidence may be evidence of adverse effects of conflict.   If a defendant were to submit evidence of impairment to a client's defense based on counsel's representation restrained or diminished by conflicting interests, demonstrating counsel's struggle to serve two masters, it would evince an actual conflict that resulted in impaired representation giving cause for reversal of the conviction.   Cuyler,

446 U.S. at 349.   In short, in order to present a successful conflict-claim, there needs to be an identified "actual lapse in representation[.]" Id. (relying on Dukes v. Warden, 406 U.S. 250, 256 (1972)).

Here, as noted by the FSC, Petitioner failed to show a conflict actually affected the adequacy of counsel's representation.   Mungin II at 1002. Petitioner presented no evidence of inconsistent interests that hindered or impaired Mr. Cofer's performance.   See Freund v. Butterworth, 165 F.3d 839, 859 (11th Cir.), cert. denied, 528 U.S. 817 (1999).   Nor is there evidence that there was an alternative strategy that was dismissed or rejected because it conflicted with external loyalties.   Quince v. Crosby, 360 F.3d 1259, 1264 (11th Cir.) (citing Reynolds, 253 F.3d at 1343), cert. denied, 543 U.S. 960 (2004).   See Smith v. White, 815 F.2d 1401, 1404 (11th Cir.) (recognizing this circuit adopted a test that enables courts to distinguish actual from potential or hypothetical conflicts and requiring a showing that inconsistent interests led counsel to make a choice between one path more favorable to one client but harmful to another), cert. denied, 484 U.S. 863 (1987).

The heart of the issue is whether external loyalties caused counsel to fail to pursue a reasonable and plausible alternative strategy.   Reynolds, 253 F.3d at 1343 (citing Freund, 165 F.3d at 860).   On this record, it is quite apparent there is no evidence of divided loyalty on Mr. Cofer's part.   He knew that Mr.

Kirkland's misdemeanor convictions could not be used to impeach him.   Ex. GG at 249, 341.   Mr. Cofer utilized other reasonable and effective strategies to best represent his client and challenge and attack Mr. Kirkland's testimony and his identification of Petitioner.   Id. at 346-47.

Petitioner cannot identify any flaw in Mr. Cofer's performance that was related to the fact that his co-workers in the Public Defender's Office represented Mr. Kirkland.   There were no actions taken by Mr. Cofer or not taken that were influenced by conflicted loyalties of his Office.   Indeed, the record shows Mr. Cofer advocated diligently on behalf of his client and did not exhibit divided loyalties.

Apparently Mr. Cofer did not recognize that the Public Defender's Office actually represented Mr. Kirkland, and neither the state nor Mr. Kirkland informed him of such representation.   Thus, Petitioner does not meet the requirements of § 2254(d)(1) as he has "failed to establish a conflict of interest that violated the Sixth Amendment, because his counsel could not have been affected by a conflict of which he was unaware."   Hunter v. Sec'y, Dep't of Corr., 395 F.3d 1196, 1202 (11th Cir.), cert. denied, 546 U.S. 854 (2005).

Petitioner cannot satisfy the "contrary to" test of 28 U.S.C. § 2254(d)(1) as the state court analyzed Petitioner's claims under Strickland and Cuyler. The state court's ruling is based on a reasonable determination of the facts and

84

a reasonable application of the law.   Petitioner has failed to demonstrate that the state court unreasonably applied <u>Strickland</u> and <u>Cuyler</u> or unreasonably determined the facts.   Thus, the state court's decision is entitled to AEDPA deference.

Petitioner is not entitled to relief on his claim of conflict and his Sixth Amendment claim of his right to conflict-free counsel.   As such, ground three is due to be denied.

## X.   GROUND FOUR

**Ground Four:   FSC misinterpreted the holding in <u>Griffin</u>[34] in its opinion on direct appeal, resulting in an opinion that was contrary to well-established federal law or an unreasonable application of clearly established Supreme Court law.**

In this ground, Petitioner asserts that the FSC improperly applied the holding in <u>Griffin</u> rather than the rule set forth in <u>Yates v. U.S.</u>, 354 U.S. 298, 311-12 (1957), <u>Stromberg v. People of State of Cal.</u>, 283 U.S. 359, 369-70 (1931), and <u>Zant v. Stephens</u>, 462 U.S. 862, 881 (1983).[35]   Second Amended Petition at 140-41.   He submits that <u>Griffin</u> is only applicable to federal law and not binding on the states.   <u>Id</u>. at 142.   Arguing <u>Griffin</u> does not control, he

---

34  <u>Griffin v. U.S.</u>, 502 U.S. 46 (1991).

35  In <u>Zant</u>, 462 U.S. at 884, the United States Supreme Court decided that assuming <u>Stromberg</u> is applicable in the sentencing context, the death penalty was not required to be vacated as jury found the existence of other valid statutory aggravating circumstances, although another aggravating circumstance was found to be invalid as insufficient by itself.

contends no deference is due to the FSC's decision in Mungin I at 1029-30. Second Amended Petition at 142-43.

Respondents counter that Griffin, at a minimum, stands for the proposition that if there is insufficient evidence to support one ground of conviction, the conviction is not undermined if there is an alternative independent basis to support the conviction.   Response at 106. Acknowledging that while the FSC ultimately determined there was insufficient evidence to uphold a conviction for premeditated murder, it found the evidence sufficient to support a conviction for felony murder.   Id. at 102-103.

On direct appeal, the FSC found "the evidence does not support premeditation[.]" Mungin I at 1029.   As such, the court found it was error to instruct the jury on both premeditation and felony murder.   Id.   Relying on Griffin, the FSC concluded that the general verdict need not be set aside because it did not rest on an unconstitutional ground or a legally inadequate theory; instead, it was a situation "where the general verdict could have rested upon a theory of liability without adequate evidentiary support when there was an alternative theory of guilt for which the evidence was sufficient."   Id. at 1030.   The error was found to be harmless.   Id.

86

The Court undertakes a review of the record to provide context to this ground.   The record contains the Indictment for murder in the first degree. Ex. A at 1.   It reads:

> The Grand Jurors of the State of Florida and County of Duval, empaneled and sworn to inquire and true presentment make in and for the body of the County of Duval, upon their oaths, do present and charge that ANTHONY MUNGIN, on the 16th day of September, 1990, in the County of Duval and the State of Florida, unlawfully and from a premeditated design to effect the death of Betty Jean Woods, a human being, did then and there kill the said Betty Jean Woods by shooting her with a handgun giving her certain mortal wounds from which she did thereafter continually languish and languishing, did live until the 20th day of September, 1990, on which date she died of the mortal wounds aforesaid, contrary to the provisions of section 782.04(1)(A), Florida Statutes.

Ex. A at 1.

As allowed in Florida, the court charged both premeditated murder and felony murder.   Ex. E at 309-23.   The circuit court provided a general verdict form to the jury, and the jury found the defendant guilty of murder in the first degree.   Id. at 324.

In Gudinas v. McNeil, this Court addressed a claim similar to that raised herein and denied relief:

> Here, Petitioner is not entitled to any relief on the basis of Yates or any of its progeny because, in Florida, it is legally permissible to proceed on a theory

of felony murder even though the indictment charges premeditated murder. In contrast to <u>Yates</u> and <u>Stromberg</u>, Petitioner's case is properly governed by <u>Griffin v. U.S.</u>, 502 U.S. 46, 56, 112 S. Ct. 466, 116 L.Ed.2d 371 (1991). In <u>Griffin</u>, the United States Supreme Court refused to extend the <u>Yates</u> and <u>Stromberg</u> holdings to a claim that a general verdict form must be set aside because one of the bases of conviction is "unsupported by sufficient evidence." <u>Id</u>. at 56. Petitioner's case is more akin to <u>Griffin</u>, and further distinguishable from <u>Yates</u>, because Petitioner challenges the verdict form on an alleged insufficiency of the evidence to support one of the bases of conviction, namely premeditated murder. Nonetheless, it is not controverted, even by Petitioner, that the evidence of record supports Gudinas' conviction on felony murder. Consequently, Petitioner can show no constitutional violation based upon the general verdict form. <u>See also</u> <u>Knight v. Dugger</u>, 863 F.2d 705, 725 (11th Cir.1988) (noting that Florida law has long recognized that the prosecution may proceed on either felony murder or premeditated murder when the indictment charges only the offense of first degree murder or premeditated murder, and finding that even if the trial court erred in permitting the State to proceed on both theories the "[Court] is convinced that such error was not of a constitutional dimension. The benefit to the state from the error (if any was committed) did not contribute to Petitioner's conviction since there was ample evidence upon which to base a conviction under either theory.").

<u>Gudinas v. McNeil</u>, No. 2:06-cv-357-FtM-36DNF, 2010 WL 3835776, at *30 (M.D. Fla. Sept. 30, 2010) (not reported in F.Supp.2d) (footnote omitted), <u>aff'd</u> <u>sub nom</u>. <u>Gudinas v. Sec'y, Dep't of Corr.</u>, 436 F. App'x 895 (11th Cir. 2011).

Indeed, it is legally permissible to proceed on a theory of felony murder, despite the indictment's charge of premeditated murder; therefore <u>Yates</u> and its progeny are distinguishable and postconviction relief unwarranted. <u>Hannon v. Sec'y, Dep't of Corr.</u>, 622 F.Supp.2d 1169, 1232 (M.D. Fla. 2007), <u>aff'd</u>, 562 F.3d 1146 (11th Cir. 2009).   Also of note, in order to obtain <u>Stromberg</u> relief, there must be a showing of three factors: (1) the jury was instructed that a guilty verdict could be returned with respect to any one of several listed grounds, (2) it is impossible to determine from the record on which ground the jury based the conviction, and (3) **one of the listed grounds was constitutionally invalid**.   <u>Stromberg</u>, 283 U.S. at 368 (emphasis added).   The third prong is required; therefore, for a <u>Stromberg</u> attack to be successful, there must be a charge to the jury that set forth as a ground for conviction the violation of a statute previously held unconstitutional.   <u>Knight v. Dugger</u>, 863 F.2d 705, 730 (11th Cir. 1988).   As both premeditated murder and felony murder exist under Florida law and neither was declared unconstitutional prior to Petitioner's trial, reliance on <u>Stromberg</u> is unwarranted.

Petitioner asks for relief similar to that sought by the petitioner in <u>Hebert v. Tucker</u>, No. 3:11cv37/MCR/EMT, 2012 WL 1130075, at *8 (N.D. Fla. Feb. 14, 2012) (not reported in F.Supp.2d), <u>report and recommendation</u>

adopted by 2012 WL 1130001 (N.D. Fla. Apr. 4, 2012) (not reported in F.Supp.2d), a case seeking an extension of the holding in Yates (one of the possible bases of conviction was illegal) and Stromberg (one of the possible bases of conviction was unconstitutional) to a situation where one of the possible bases of conviction was merely unsupported by sufficient evidence. The federal district court rejected the "semantical argument" that insufficiency of proof is "legal insufficiency" or "legal error" as used in Yates.[36]  Hebert, 2012 WL 1130075, at *12.   Again, jurors are considered to be well equipped to analyze the evidence and reject a factually inadequate theory of the case.   Id. at *9.

Petitioner argues that Parker v. Sec'y for Dep't of Corr., 331 F.3d 764, 777 (11th Cir. 2003), abrogation recognized by Parker v. U.S., 993 F.3d 1257, 1265 (11th Cir. 2021), a post-Griffin Eleventh Circuit case lends support to his contention that the Stromberg/Yates/Zant rule "still applies" and is applicable in this instance.   Yes, the Stromberg/Yates/Zant rule applies in relevant circumstances, but Petitioner's case is distinguishable as his circumstance calls into play the holding in Griffin (a conviction need not be set aside when

---

[36] Of note, the Eleventh Circuit has opined that it is unlikely that the decision in Yates is constitutionally compelled or reliant upon the Due Process Clause, thus, the holding in Yates has been considered to fall far short of the clarity required to render a state court's adjudication contrary to clearly established federal law.   Clark v. Crosby, 335 F.3d 1303, 1309-10 (11th Cir. 2003), cert. denied, 540 U.S. 155 (2004).

the jury returns a general verdict and the evidence is insufficient to support a conviction on one, but not every ground).

For instance, in <u>Clark</u>, 335 F.3d at 1308-1310, an opinion rendered shortly after <u>Parker v. Sec'y for Dep't of Corr.</u>, the Eleventh Circuit recognized that <u>Griffin</u> departed from the rule announced in <u>Stromberg</u> and <u>Yates</u> and proceeded to examine the petitioner's state court conviction and argument in light of the <u>Stromberg</u>, <u>Yates</u>, and <u>Griffin</u> line of cases.   The Eleventh Circuit provided an in-depth examination of the three cases, never found <u>Griffin</u> inapplicable to its analysis, and proceeded to analyze the petitioner's claim and challenge to Florida state-court conviction in light of these decisions.

Petitioner's contention that <u>Griffin</u> is only applicable to federal law and not binding on the states is simply without merit.   Indeed, as recognized since <u>Griffin</u>, "a general verdict may be upheld where the jury is instructed on alternative theories of guilt, even if one but not all of the particular theories charged is <u>factually inadequate</u>, that is, there is insufficient evidence to support a conviction on one, but not every, ground charged."   <u>Anderson v. Jones</u>, No. 1:15cv186/MMP/EMT, 2017 WL 7038416, at *8 (N.D. Fla. Jan. 9, 2017) (not reported in F. Supp.) (emphasis in original) (citing <u>Griffin</u>, 502 U.S. at 58-59), <u>report and recommendation adopted sub nom.</u> <u>Anderson v. Sec'y, Fla. Dep't of Corr.</u>, No. 1:15-cv-00186-WTH-EMT, 2018 WL 522770 (N.D. Fla. Jan.

23, 2018) (not reported in F. Supp.).   <u>See</u> <u>Gudinas</u>, 2010 WL 3835776, at *30 (considering an attack on an Orange County, Florida conviction for murder, and finding the case properly governed by <u>Griffin</u>, not <u>Yates</u> and <u>Stromberg</u>).

The Court finds the FSC's denial of this claim is entitled to deference. Because Petitioner has not shown that the state court's decision and rejection of the claim was either contrary to, or an unreasonable application of federal law, or an unreasonable determination of the facts based upon the evidence, this ground is due to be denied.   The claim is without merit and Petitioner is not entitled to habeas corpus relief.

## XI.   GROUND FIVE

**Ground Five:   Insufficiency of the evidence.**

Petitioner asserts there was no basis in the evidence to support the underlying felony of robbery or attempted robbery to support the conviction as to felony murder.   He argues that the state's theory that there was a robbery followed by a shooting "is mere conjecture."   Second Amended Petition at 148. He avers that the FSC's decision denying this claim is contrary to and/or an unreasonable application of federal law.   <u>Id</u>. at 146.   Finally, he asserts the evidence of robbery is insufficient under <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979).   Second Amended Petition at 148.

On direct appeal, Petitioner raised a claim that the evidence was insufficient to prove first degree murder.  Ex. W at 29-35.  He raised a subclaim that the evidence was insufficient to prove robbery.  Id. at 35-40. He claimed the denial of the motion for judgment of acquittal amounted to error.  Id. at 35.  Petitioner argued the evidence that the shooter was engaged in a robbery was circumstantial as there were no witnesses to the shooting; therefore, there was no direct evidence that the shooting of the victim occurred during a robbery and the motion for judgment of acquittal should have been granted.  Id.

The ground presented in the appeal brief was couched in terms of trial court error.  Petitioner did however, at the close of his brief, provide an additional issue, contending his conviction and sentence violate the Florida and United States Constitutions.  Id. at 94.  Of import, he claimed the evidence of robbery was insufficient as previously discussed, and relying on Jackson, he contended the evidence presented at trial fails to constitute proof of robbery beyond a reasonable doubt within the meaning of the Due Process Clause of the United States Constitution.  Id.

The FSC agreed with Petitioner that the trial judge erred in denying the motion for judgment of acquittal as to premeditation but affirmed the trial court's decision to deny the motion for judgment of acquittal as to felony

murder, finding the evidence supported the conviction for felony murder. <u>Mungin</u> I at 1029.   In support of its affirmance, the FSP highlighted the following evidence:

> The evidence shows that Mungin entered the store carrying a gun, that $59.05 was missing from the store, that money from the cash box was gone, that someone tried to open a cash register without knowing how, and that Mungin left the store carrying a paper bag.  We find that this evidence supports robbery or attempted robbery, and there is no *reasonable* hypothesis to the contrary.

<u>Id</u>.

The trial record demonstrates Mr. Lewis H. Buzzell, co-counsel for Petitioner, moved for judgment of acquittal asserting, "there is insufficient evidence through felony murder based on robbery."   Ex. I at 904.   He argued the only evidence that any property was taken was the audit and the testimony that $59.05 was missing from Lil' Champ.   <u>Id</u>.   Mr. Buzzell claimed this testimony was unpersuasive as the security officer for Lil' Champ could not state where the unusual amount of money was missing from or how he arrived at the figure of missing money.   <u>Id</u>.   Finally, Mr. Buzzell stated this testimony was circumstantial evidence and there was a reasonable hypothesis of innocence that the shooter did not do a robbery.   <u>Id</u>.   The court commented: "felony murder is any attempt to commit one of these."   <u>Id</u>.

Mr. Buzzell pointed out that although one of the registers was open, that was consistent with the testimony that it was company policy to leave the register open.   Id. at 905.   He also noted that no money was missing from the registers.   Id.

Mr. de la Rionda responded that there was $59.05 missing.   Id. at 906. Also, he argued, "you only need attempted armed robbery."   Id.   He referred to the testimony that money could be kept on the clips or in the carton underneath the cash register.   Id.   Finally, he noted the testimony that the one cash register that did have money also had the E key punched in, signifying some tampering with the register.   Id.

In addition, Mr. de la Rionda argued there was evidence connecting Petitioner to the scene, including the gun that was used to commit the killing found where Petitioner was located, a bullet found at the murder scene, the shell casing from the murder scene, the bullet from the victim matching the gun found with Petitioner, and the relevant location of the two stolen vehicles found in Florida and Georgia.   Id. at 906-907.   After hearing argument, the court denied the motion for judgment of acquittal.   Id. at 907.   Thereafter, Mr. Buzzell renewed the motion for judgment of acquittal, relying on the same grounds and argument.   Id. at 960.   The court denied the renewed motion. Id. at 961.

Petitioner has not established that the FSC's decision was contrary to or an unreasonable application of federal law, nor that there was an unreasonable determination of the fact.   The Court will give deference under AEDPA to the FSC's decision.

Petitioner is not entitled to habeas relief on his claim of a Fourteenth Amendment violation.   A state prisoner is entitled to habeas relief if the federal court finds: "upon the record evidence adduced at the trial no rational trier of fact could have found proof beyond a reasonable doubt."   McDaniel v. Brown, 558 U.S. 120, 121 (2010) (per curiam) (quoting Jackson, 443 U.S. at 324).   Not only must the federal court consider all of the evidence admitted at trial the court must also review the evidence in the light most favorable to the prosecution.   Jackson, 443 U.S. at 319.   This criterion impinges upon the jury's role, "only to the extent necessary to guarantee the fundamental protection of due process of law."   Id. (footnote omitted).

Upon review, the evidence adduced at Petitioner's trial was sufficient to convict Petitioner of felony murder.   After viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found Petitioner committed the offense of robbery or attempted robbery.   See McDonald v. Sec'y, Dep't of Corr., No. 8:18-cv-973-T-33CPT, 2018 WL

10517118, at *7 (M.D. Fla. Oct. 31, 2018) (not reported in F. Supp.) (attempted robbery is sufficient to support felony murder).

The record shows the court charged the jury as follows.   After providing the charge for premeditated murder, the court charged felony murder:   Ex. E at 312-13.   The court gave three elements for felony murder: (1) Betty Jean Woods is dead; (2)(a) the death occurred as consequence of and while Petitioner was engaged in the commission of robbery; or (b) the death occurred as a consequence of and while Petitioner was attempting to commit robbery; (3) Petitioner was the person who actually killed Betty Jean Woods.   Id.   The court defined robbery, providing four elements: (1) Petitioner took money from the person or custody of Betty Jean Woods; (2) the taking was by force, violence or assault, or by putting Betty Jean Woods in fear; (3) the property taken was of some value; and (4) Petitioner took money from the person or custody of Betty Jean Woods and at the time of the taking intended to permanently deprive Betty Jean Woods of the property or any benefit from it.   Id. at 313. The court also defined attempt to commit robbery, providing the following: (1) Petitioner did some act toward committing the crime of robbery that went beyond just thinking or talking about it, and (2) he would have committed the crime except that he failed.   Id. at 314-15.

Petitioner asserts that reliance on the cash count was misguided because the source was a matter of discrepancy and could have been based on a mistaken conclusion and reliance on the testimony concerning the "E" indicator on a cash register was similarly unfounded.   Second Amended Petition at 146-48.   In reviewing the evidence in the light most favorable to the prosecution, a rational trier of facts could have found Petitioner committed robbery or attempted robbery.   Mr. Kirkland testified he observed Petitioner departing the store carrying a brown bag and then Mr. Kirkland discovered the injured clerk inside the store.   The state presented testimony that money was missing from the store and there was evidence that someone attempted to open a cash register.   There was extensive ballistics evidence tying Petitioner to the shooting, including the police finding a .25-caliber semiautomatic pistol and bullets during a search of Petitioner's house in Georgia and the evidence that a bullet recovered from Woods had been fired from the pistol found at Petitioner's house.   Mungin I at 1028.

After reviewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found Petitioner committed the robbery or attempted robbery and ultimately committed felony murder. Although there may be conflicting inferences, there is a presumption that the jury resolved the conflicts in favor of the prosecution.   Johnson v. Ala., 256

F.3d 1156, 1172 (2001) ("federal courts must defer to the judgment of the jury in assigning credibility to the witnesses and in weighing the evidence"), cert. denied, 535 U.S. 926 (2002).   Viewing the record of the evidence and reasonable inferences in the light most favorable to the prosecution and referring to the essential elements of the crimes as defined by Florida state law, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.   See Wilcox v. Ford, 813 F.2d 1140, 1143 (11th Cir.) (given that evidence may give some support to the defendant's theory of innocence, that is not sufficient to warrant habeas relief), cert. denied, 484 U.S. 925 (1987).   Also, as a matter of federal constitutional law, Florida's circumstantial evidence rule has no place in the sufficiency of the evidence analysis as a matter of federal constitutional law.   Id. at 1145 n.7.   On the contrary, there is no requirement under federal law that the prosecution has an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt.   Jackson, 443 U.S. at 326.   Petitioner is not entitled to relief under Jackson as no due process violation exists.

Thus, this Court will defer to this resolution as well as give AEDPA deference to the FSC's decision to the extent the claim was raised and addressed in the federal constitutional sense.   The state court's rejection of the constitutional claim is entitled to deference under AEDPA.   McDaniel v.

Brown, 558 U.S. at 132 (a reviewing court must not depart "from the deferential review that Jackson and § 2254(d)(1) demand").  See Preston v. Sec'y, Fla. Dep't of Corr., 785 F.3d 449, 463 (11th Cir. 2015) (recognizing that a petitioner raising a Jackson claim faces a high bar in federal habeas due to the two layers of judicial deference) (citing Coleman v. Johnson, 566 U.S. 650, 651 (2012) (per curiam)).   As such, Petitioner is not entitled to habeas relief on this ground.

## XII.   GROUND SIX

**Ground Six:   Ineffective assistance of appellate counsel.**

In ground six, Petitioner claims he received ineffective assistance of appellate counsel in violation of the Sixth Amendment.   Second Amended Petition at 148.   He claims his appellate counsel was ineffective for failure to raise an issue concerning the state's introduction of hearsay testimony during the penalty phase, specifically, the testimony of Tallahassee police officer Cecil Towle concerning the facts of a prior crime that had been used during the guilt phase as Williams rule evidence.   Id. at 151-52.   Petitioner contends his right to confrontation under Crawford v. Washington, 541 U.S. 36 (2004) was violated.   Second Amended Petition at 159-61.   He also complains that over defense objection, the trial court permitted the state to introduce two photographs of the victim of the Tallahassee case and appellate counsel failed

to argue that the admission of the photographs was improper and constituted error as the prejudicial nature of the photographs outweighed the probative value.   Id. at 152-53, 163-64.

The record demonstrates that during the penalty phase, the state called Cecil Towle, a homicide investigator for the Tallahassee Police Department. Ex. O at 1125.   When the prosecutor inquired as to Meihua Want Tsai's statements in her interview, Mr. Buzzell objected on the basis of hearsay and otherwise inadmissible.   Id. at 1126-27.   Mr. de la Rionda countered, "I believe hearsay is admissible in this proceeding."   Id. at 1127.   The court overruled the objection.   Id.

Concerning the photographs, Mr. de la Rionda inquired if photographs were taken of injuries to Ms. Tsai's hand.   Id. at 1129.   Mr. Towle said the photograph depicted Ms. Tsai's right hand, with a contact wound to the middle finger with charring and blackening of the wound area.   Id. at 1130.   The other photograph was a photograph of the victim in the emergency room, with blood on her pillow and in front of her blouse.   Id.   Mr. Buzzell objected to their introduction into evidence, stating the prejudicial value outweighs the probative value, especially since the defense is stipulating Petitioner had been convicted of a violent felony as a result of the incident.   Id. at 1131.   Mr. Buzzell raised the specter of the right to due process under the Fifth and

Fourteenth Amendments with regard to it being victim impact evidence of a collateral offense. <u>Id</u>. Mr. de la Rionda responded that he was not introducing the photographs to demonstrate victim impact but to show the identity of the victim with the hand injury and to show it was a close-range shot. <u>Id</u>. The court overruled the objection and received the evidence. <u>Id</u>.

Petitioner faces several obstacles. The use of hearsay testimony of a police officer discussing a prior crime during the penalty phase does not constitute error.[37] <u>Mungin</u> II at 1003. Under these circumstances appellate counsel was not ineffective for failure to raise the issue on appeal. To the extent Petitioner was attempting to raise a confrontation claim under <u>Crawford</u>, <u>Crawford</u>'s principles are inapplicable to Petitioner because <u>Crawford</u> is not retroactive. <u>Whorton v. Bockting</u>, 549 U.S. 406, 421 (2007) (finding the new rule in <u>Crawford</u> is not a watershed rule of criminal procedure). <u>See</u> <u>Mungin</u> II at 1003 (citing <u>Chandler v. Crosby</u>, 916 So. 2d 728 (Fla. 2005)). Trial counsel made a hearsay objection, but the United States Supreme Court has "been careful 'not to equate the Confrontation Clause's prohibitions with the general rule prohibiting the admission of hearsay

---

37 Under Florida law, hearsay testimony is admissible in the penalty phase, allowing that the defendant is afforded a fair opportunity to rebut any hearsay statements. <u>Hodges v. Sec'y, Dep't of Corr.</u>, No. 8:03-cv-01591-SCB-TGW, 2007 WL 604982, at * 6 (M.D. Fla. Feb. 22, 2007) (not reported in F.Supp.2d) (citing Fla. Stat. § 921.141(1)).

statements[,]'" although both the rules and the clause are generally designed to protect similar values.   White v. Ill., 502 U.S. 346, 352 (1992) (quoting Idaho v. Wright, 497 U.S. 805, 814 (1990)).   Finally, there is no Confrontation Clause violation as "hearsay evidence is admissible at a capital sentencing." Chandler v. Moore, 240 F.3d 907, 918 (11th Cir.), cert. denied, 534 U.S. 1057 (2001).

In Mungin II at 1004, the FSC noted, during the penalty phase, the same standard was applicable for both the introduction of testimony concerning prior violent felony convictions as well as photographs.   As such, the court reasoned that the photographs of the victim of a prior violent felony are admissible if relevant and the prejudicial effect of the photographs does not outweigh the prejudice.   Id.   The court found the photographs relevant as they showed the victim and "the circumstances of the Tallahassee shooting." Id.   Also, even assuming they were not relevant, the FSC found their admission harmless beyond a reasonable doubt.   Id.   As such, the FSC denied the claim of ineffective assistance of appellate counsel.   Id.

The state court's determination is consistent with federal precedent. The criteria for proving ineffective assistance of appellate counsel parallels that of ineffective assistance of trial counsel, with the second prong focusing on whether the deficiency in the performance compromised the appellate

process to the degree as to undermine confidence in the correctness of the result.   Mungin II at 1003 (citation omitted).

Petitioner's burden is a heavy one.   He must show that his appellate counsel was objectively unreasonable in failing to raise these matters on appeal.   If he satisfies that requirement, he must then show a reasonable probability that, but for counsel's unprofessional errors, he would have a reasonable probability of success on appeal.   It is a difficult task to show appellate counsel was incompetent.   Smith v. Robbins, 528 U.S. 259, 288 (2000).   "Appellate counsel's performance will be deemed prejudicial only if we find that 'the neglected claim would have a reasonable probability of success on appeal.'"   Farina v. Sec'y, Fla. Dept. of Corrections, 536 F. App'x 966, 979 (11th Cir. 2013) (per curiam) (quoting Heath v. Jones, 941 F.2d 1126, 1132 (11th Cir. 1991)), cert. denied, 574 U.S 1003 (2014).

An effective appellate attorney will weed out weaker arguments, even if they may have merit.   Philmore v. McNeil, 575 F.3d 1251, 1264 (11th Cir. 2009) (per curiam), cert. denied, 559 U.S. 1010 (2010).   Upon review, Petitioner's appellate counsel raised nine issues on direct appeal in a brief consisting of just under one hundred pages.   Ex. W.   Addressing Issue 2 of the brief (the evidence was insufficient to prove first-degree murder), the FSC agreed with Petitioner that the trial judge erred in denying Petitioner's motion

for judgment of acquittal as to premeditation.  <u>Mungin</u> I at 1029.  The FSC also found it was error to instruct the jury on premeditation as the evidence did not support premeditation.  <u>Id</u>.  Although Petitioner prevailed on this significant issue, ultimately, the FSC affirmed both the conviction of first-degree murder and the sentence, finding sufficient evidence of felony murder. <u>Id</u>. at 1029-30, 1032.

Had Petitioner's appellate counsel raised the claims Petitioner now contends should have been raised on direct appeal, no appellate relief would have been forthcoming as evinced by the FSC's decision denying post-conviction relief on the claim of ineffective assistance of appellate counsel. Thus, Petitioner has failed to show a reasonable probability the outcome of the direct appeal would have been different had appellate counsel argued as Petitioner's suggests appellate counsel should have on direct appeal.

Petitioner has not shown that the FSC decided his claim of ineffective assistance of appellate counsel in a manner contrary to <u>Strickland</u>, or that the FSC's application of <u>Strickland</u> was objectively unreasonable.  Appellate counsel need not raise every nonfrivolous issue.  As previously noted, appellate counsel proceeded with strong arguments and prevailed on a significant issue, although the court affirmed the conviction on the alternative

theory of felony murder and affirmed the sentence of death.   See Mungin II at 992.

The FSC's decision is entitled to AEDPA deference.   The denial of relief on the ineffective assistance of appellate counsel claim was neither contrary to, nor an unreasonable application of Strickland.   The FSC applied the criteria set forth in Strickland.   Mungin II at 1003.   Upon review, its adjudication of the claim of ineffective assistance of appellate counsel is not contrary to or an unreasonable application of Strickland and its progeny or based on an unreasonable determination of the facts.   Therefore, the FSC's decision is entitled to deference and the ground is due to be denied.

Petitioner has failed to demonstrate that his state court proceeding was fundamentally unfair and his appellate counsel ineffective.   Thus, he has failed to demonstrate constitutional violations.   As such, he is not entitled to habeas relief.

## XIII.   GROUND SEVEN

**Ground Seven: FSC erred in finding admission of collateral crime evidence harmless error.**

In ground seven, Petitioner contends that the FSC's analysis of harmless error is contrary to and or an unreasonable application of the decision in Chapman v. Cal., 386 U.S. 18 (1967).   The rule set forth in Chapman is:

"before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt[,]" id. at 24, that is, a petitioner is "entitled to a trial free from the pressure of unconstitutional inferences."  Id. at 26.

On direct appeal, Petitioner claimed, "the trial court erred in allowing the State to introduce irrelevant evidence that Mungin shot a collateral crime victim in the spine[.]" Mungin I at 1029 n.4.  The FSC denied this ground finding any error was harmless as the state did not dwell on or unduly emphasize that the victim was shot in the spine.  Id. at 1030 n.7.  Petitioner urges this Court to find that the FSC erred in allowing the presentation of this evidence, arguing the introduction of the inflammatory and prejudicial evidence that Petitioner shot Mr. Rudd in the back was not harmless as Mr. Rudd was asked to step down from the stand and demonstrate how and where he was shot, emphasizing both the nature of the injury and the location of the shot.   Second Amended Petition at 165-66.

The trial record demonstrates the following.  The state called Mr. William W. Rudd, a cashier clerk for Bishop's Country Store and the victim in the Jefferson County case.  Ex. I at 713-14.  The prosecutor asked the witness to step down from the witness stand and indicate where he was shot.  Id. at 721.  He complied and said he was hit in his spine in the upper part of his

back.   Id.   Mr. Buzzell objected to the testimony as being irrelevant for purposes of identity or any other limited purpose under the Williams rule.   Id. The prosecutor responded it will be relevant, and the court overruled the objection.   Id.   The prosecutor asked Mr. Rudd what happened after he was shot in the back, and Mr. Rudd responded that the shot to the spine paralyzed him, rendered him temporarily unconscious, but he woke up momentarily and saw Petitioner getting money out of the money box under the counter, a place for excessive money not placed in the cash register.[38]   Id. at 721-22.

To the extent Petitioner is complaining about a ruling regarding the admissibility of evidence under Florida law, the claim is not cognizable in this federal habeas proceeding.   See Baxter v. Thomas, 45 F.3d 1501, 1509 (11th Cir.) (federal habeas is not the proper vehicle to correct evidentiary ruling), cert. denied, 516 U.S. 946 (1995)).   This Court must give state courts wide discretion in determining the admissibility of evidence.   See Boykins v. Wainwright, 737 F.2d 1539, 1543 (11th Cir. 1984) (correction of erroneous state court evidentiary rulings in not the province of the federal courts), cert. denied, 470 U.S. 1059 (1985).   Of import, "it is not the province of a federal habeas court to reexamine state-court determination on state-law questions."   Estelle

---

38 Trial testimony revealed similar circumstances in the Duval County case, with money being placed in the Lil' Champ store in locations other than the register, the clerk being shot during the offense, and the count of the store's money being short afterwards.

v. McGuire, 502 U.S. 62, 67 (1991).   Indeed, in reviewing evidentiary decisions, federal courts do not act as "super" state supreme courts.   Shaw v. Boney, 695 F.2d 528, 530 (11th Cir. 1983) (per curiam) (citations omitted).

This Court is limited to determining whether the conviction violated the Constitution, law, or treaties of the United States.   28 U.S.C. § 2241.   Thus, the fundamental question is whether an error was of such magnitude "as to deny fundamental fairness to the criminal trial."   Alderman v. Zant, 22 F.3d 1541, 1555 (11th Cir.), cert. denied, 513 U.S. 1061 (1994).   See Shaw, 695 F.2d at 530 (regarding state evidentiary rulings, the standard of fundamental fairness in habeas is whether the trial court error was "material in the sense of a crucial, critical, highly significant factor") (quoting Hills v. Henderson, 529 F.2d 397, 401 (5th Cir. 1976)).   If a ruling denies fundamental constitutional protections it is the federal court's duty to enforce the constitutional guarantees.

Petitioner's brief on direct appeal appears to rely solely on a state harmless-error rule.   Ex. W at 49-56.   The specific claim set forth in Issue III of the brief is: "the trial court erred in allowing the state to show that Mungin shot collateral crime victim William Rudd in the back, hitting his spine.   This evidence was irrelevant and not harmless."   Id. at 49.   Neither the Fifth nor Fourteenth Amendments are mentioned in the brief nor is any reference made

to rights guaranteed under the United States Constitution or citation to Chapman.   See Chapman, 386 U.S. at 21 (a state harmless-error rule is a state question involving errors of state procedure or state law, not a federal question based on a federal constitutional guaranteed right).

In his appeal brief, Petitioner claimed reversible error relying on Amoras v. State, 531 So. 2d 1256, 1259-60 (Fla. 1988) (per curiam) (addressing the applicability of the Williams rule concerning admissibility of similar fact evidence of another crime codified in the Florida Evidence Code § 90.404(2)(a) and the test of relevancy contained in Fla. Stat. § 90.401)) and other Florida cases.   In closing, Petitioner said remand was required without elaboration or contention of a federal constitutional violation and referenced State v. DiGuilio, 491 So. 2d 1129, 1135-36 (Fla. 1986), a case which references Chapman and its progeny in the context of reviewing a claim concerning comments on silence, a recognized high-risk error.   Ex. W at 56.

Petitioner claims the trial court erred by allowing evidence to be admitted as Williams rule[39] evidence and the FSC erred in affirming that

---

39  "Under the Williams rule, evidence of collateral crimes is admissible '[i]f found to be relevant for any purpose save that of showing bad character or propensity.'"   Green v. Sec'y, Dep't. of Corr., No. 8:15-cv-1259-T-35TGW, 2018 WL 10759184, at *4 n.3 (M.D. Fla. Sept. 12, 2018) (quoting Williams v. State, 110 So. 2d at 662).

decision as harmless.[40]   He claims the FSC's analysis was itself contrary to or an unreasonable application of Supreme Court precedent, citing only <u>Chapman</u>.   Second Amended Petition at 165.   The focus of this contention appears to be on the fact that the state court did not in its decision affirming the trial court address whether the state met its burden to establish that error was harmless beyond a reasonable doubt.   Petitioner argues that the FSC's analysis of harmless error should not be relied upon because the state court did not provide sufficient analysis to support its conclusion or use the magic words: "harmless beyond a reasonable doubt."[41]   <u>Id</u>.

Petitioner seemingly relies on the Due Process Clause to support his contention of a constitutional violation; however, he fails to identify any Supreme Court case holding that the admission of collateral crime evidence in similar circumstances is unconstitutional.   Since Petitioner has not identified a Supreme Court case making that particular holding, he cannot show that the

---

[40]  In his Reply, Petitioner apparently construes the FSC's decision as actually finding error in the admission of alleged irrelevant evidence because the court went on to find harmlessness in its introduction.   Reply at 35.   Petitioner presumes too much.   The FSC found: "[a]ny error in Issue 3 . . . was harmless."   <u>Mungin</u> I at 1030 n.7.   Admittedly, the FSC's decision is not a model of clarity, but the court's phraseology more readily supports an interpretation that the state court considered whether there was harm after assuming "any error," not necessarily finding error.

[41]  To some extent, Petitioner seems to be asking this court to second-guess the state court evidentiary decision, something this Court will not do as the scope of review is severely restricted in this habeas proceeding.

FSC's rejection of the underlying claim was contrary to, or an unreasonable application of clearly established federal law.  See Woodward v. Sec'y, Fla. Dep't of Corr., No. 3:13-cv-155-J-34JRK, 2016 WL 1182818, at *13 (M.D. Fla. Mar. 28, 2016) (not reported in F. Supp.) (failure to identify a Supreme Court case holding that admission of collateral crime evidence in similar circumstances was unconstitutional is fatal to the habeas claim); Chase v. Sec'y, Fla. Dep't of Corr., No. 3:15-cv-571-J-34PDB, 2018 WL 6413357, at *7 (M.D. Fla. Dec. 6, 2018) (not reported in F. Supp.) (same).

Parsing the FSC's decision, it is not entirely clear whether the state court conducted its harmless error analysis under the Chapman standard. Nevertheless, this Court will proceed to address whether habeas relief should be granted solely under the Brecht standard (on collateral review, federal constitutional error is harmless unless the error had a substantial and injurious effect or influence on the jury's verdict, amounting to actual prejudice).

In Mansfield v. Sec'y, Dep't of Corr., 679 F.3d 1301, 1307 (11th Cir. 2012), cert. denied, 568 U.S. 1098 (2013), the Eleventh Circuit explained this Court's role under similar circumstances:

> "[I]n § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and

injurious effect' standard set forth in <u>Brecht</u>, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in <u>Chapman</u>." <u>Fry</u>,[42] 551 U.S. at 121–22, 127 S. Ct. 2321. Because of the "[s]tates' interest in finality," the states' "sovereignty over criminal matters," and the limitation of habeas relief to those "grievously wronged," the Supreme Court set forth in <u>Brecht</u> a standard that is more favorable to and "less onerous" on the state, and thus less favorable to the defendant, than the <u>Chapman</u> harmless beyond a reasonable doubt standard. <u>Brecht</u>, 507 U.S. at 637, 113 S. Ct. 1710; <u>accord</u> <u>Fry</u>, 551 U.S. at 117, 127 S. Ct. 2321. The Supreme Court emphasized in <u>Brecht</u> that "collateral review is different from direct review," and, therefore, that "an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." <u>Brecht</u>, 507 U.S. at 633–34, 113 S. Ct. 1710.

Since <u>Brecht</u> determined that the harmless error standard set forth in <u>Chapman</u> is inapplicable on collateral review, district courts should apply the actual prejudice standard of <u>Brecht</u> even if the state court did not apply the <u>Chapman</u> standard of proof beyond a reasonable doubt that error complained of did not contribute to the verdict.   <u>Vining v. Sec'y, Dep't of Corr.</u>, 610 F.3d 568, 571 (11th Cir. 2010) (per curiam), <u>cert. denied</u>, 563 U.S. 977 (2011).

---

42  <u>Fry v. Pliler</u>, 551 U.S. 112, 121-22 (2007)  ("We hold that in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in <u>Brecht, supra</u>, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in <u>Chapman</u>[.]").

Consequently, this Court, in considering Petitioner's claim, will apply the Brecht standard of "substantial and injurious effect" rather than the Chapman standard of "harmless beyond a reasonable doubt."   See Hodges v. Att'y Gen., State of Fla., 506 F.3d 1337, 1343 (11th Cir. 2007) (citing Fry), cert. denied, 555 U.S. 855 (2008).

Undertaking a review of the total setting, the Court finds the admission of the testimony of Mr. Rudd that Petitioner shot him in the spine amounted to harmless error under the actual prejudice standard for collateral review set forth in Brecht.   An explanation follows.

"To determine the effect on the verdict of a constitutional error, the Court must consider the error 'in relation to all else that happened' at trial."   Trepal, 684 F.3d at 1114 (quoting Kotteakos v. U.S., 328 U.S. 750, 764 (1946)).   In light of the weight of the properly admitted evidence and the isolated nature of this testimony concerning Petitioner shooting Rudd in the spine, the record of the trial cannot support a conclusion that this brief testimony had a substantial and injurious effect or influence in the determining the jury's verdict.   Evidence of Petitioner's guilt was strong.   Also, the nature of the challenged collateral crime evidence was limited.[43]   Therefore, the error

---

[43] The record demonstrates there was ample evidence against Petitioner, including but not limited to the testimony of Mr. Kirkland identifying Petitioner and placing him at the store carrying a paper bag, the testimony concerning the money missing from the store, and the

complained of was harmless under the applicable <u>Brecht</u> standard as the admission of the challenged testimony, even if erroneous, did not have a substantial and injurious effect or influence on the verdict, especially given the other evidence adduced at trial to support the conviction.   As such, Petitioner is not entitled to habeas corpus relief on this ground.

Accordingly, it is now

**ORDERED AND ADJUDGED:**

1.     The Court **strikes** the Motion to Strike contained in the Response (Doc. 31 at 5-6).

2.     The Second Amended Petition for Writ of Habeas Corpus (Doc. 30) is **DENIED**.

3.     This action is **DISMISSED WITH PREJUDICE**.

4.     The **Clerk** shall enter judgment accordingly and close this case.

5.     If Petitioner appeals the denial of his Second Amended Petition for Writ of Habeas Corpus (Doc. 30), **the Court denies a certificate of appealability**.[44]   Because this Court has determined that a certificate of

---

location of the gun used in the crime found with Petitioner and tied to the crime through strong ballistics evidence.

[44] This Court should issue a certificate of appealability only if a petitioner makes "a substantial showing of the denial of a constitutional right."   28 U.S.C. § 2253(c)(2).   To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," <u>Tennard v. Dretke</u>, 542 U.S. 274, 282 (2004) (quoting <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000)), or

appealability is not warranted, the **Clerk** shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case.   Such termination shall serve as a denial of the motion.

      **DONE AND ORDERED** at Jacksonville, Florida, this 15th day of August, 2022.

_____
BRIAN J. DAVIS
United States District Judge

sa 7/27
c:
Counsel of Record

---

that "the issues presented were 'adequate to deserve encouragement to proceed further,'" <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 335-36 (2003) (quoting <u>Barefoot v. Estelle</u>, 463 U.S. 880, 893 n.4 (1983)).   Upon due consideration, this Court will deny a certificate of appealability.